**Ingeborg SCHLEIER, Personal Representative of the Estate of Shedd H. Smith, Deceased, Appellee,**

v.

**KAISER FOUNDATION HEALTH PLAN OF THE MID–ATLANTIC STATES, INC., Appellant.**

**No. 88–7106.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 2, 1988.

Decided May 26, 1989.

Rehearing and Rehearing En Banc Denied Aug. 2, 1989.

Richard W. Boone, Arlington, Va., for appellant.

Leonard Keilp, for appellee.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and FLOYD R. GIBSON,* Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit.

Opinion PER CURIAM.

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

PER CURIAM:

Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc. [hereinafter Kaiser] appeals from a judgment entered on a jury verdict in favor of Ingeborg Schleier [hereinafter Schleier], as Personal Representative of the Estate of Shedd H. Smith, her husband. Schleier brought this action under the District of Columbia survival statute claiming that Kaiser physicians negligently failed to diagnose and treat Smith's latent coronary artery disease which caused his death on June 20, 1983.

The case was submitted to the jury on Schleier's negligence claim and the jury returned a $825,000 lump-sum verdict in her favor. Kaiser now appeals raising several issues. For the reasons herein stated we hold that it was reversible error not to instruct the jury, as defendant requested, that any award to plaintiff would not be subject to income taxation; we therefore reverse the judgment in part and remand for a new trial on damages.

## I. BACKGROUND

At the time of his death, Shedd Smith was a 48–year–old urban planner for the General Services Administration in Washington, D.C. Kaiser is a health maintenance organization that provides health care to federal government employees. Smith was a paid Kaiser subscriber.

Smith was first treated at a Kaiser Clinic for abdominal pain in March 1983. On May 6, 1983, Smith spoke with a Kaiser advice nurse and complained of continual stomach pain. Six days later Smith called Kaiser again, this time because of a forty-five minute episode of severe chest pain radiating into his left shoulder. Smith was sent to the Fairfax Hospital Emergency Room where an electrocardiogram (EKG) was performed and interpreted as having non-specific S–T wave changes. Although the tests were inconclusive as to whether Smith had suffered a heart attack, a Kaiser physician admitted Smith to Fairfax Hospital Coronary Care Unit. The next day, Dr. Sherber, a cardiologist who was an outside consultant and not a Kaiser physician, was brought in to examine Smith.

Sherber's initial conclusion, after reviewing the information then available, was that it was unlikely that Smith had suffered a heart attack. However, he scheduled additional tests. Sherber found Smith's MUGA[1] test was normal but his stress EKG was abnormal. Nevertheless, Sherber thought it unlikely that Smith had coronary heart disease, and did not recommend further cardiac testing, nor did he restrict any of Smith's activities. The results of the stress EKG were then sent to Kaiser to be placed in Smith's medical chart.

During the four nights following his MUGA test, Smith complained to a Kaiser physician of profuse night sweats. After reviewing Smith's medical chart, which had not yet been updated to include his abnormal stress EKG, a Kaiser physician told Smith that the night sweats were not cardiac related.[2] Smith did not suffer any other symptoms until June 19, 1983, when he began to sweat heavily and became exhausted after mowing his lawn and doing some housework. The next day his condition deteriorated. He began to vomit and was in a very weak and tired condition.

Schleier, concerned about her husband's state, called the Kaiser advice nurse who responded that Smith would have to sweat out his condition. After making this phone call, Schleier returned to her husband and found him gasping for air. She called the rescue squad but before it arrived Smith had stopped breathing despite her attempts to resuscitate him. Smith died in the ambulance en route to the Fairfax Hospital Emergency Room.

Kaiser raises several issues on appeal including the court's denial of Kaiser's motion to transfer the case to the Eastern District of Virginia, as well as the trial court's decision denying Kaiser's motion for a judgment notwithstanding the ver-

---

**1.** The MUGA test measures the heart's contractibility and pumping ability.

**2.** At trial, Schleier introduced evidence establishing that night sweats may be a symptom of severe coronary artery disease.

dict. Kaiser also claims that it was not adequately shown that it breached its contractual duty to provide adequate health care, nor was it shown that Kaiser was liable for Sherber's negligence. Kaiser asserts that the jury could not properly determine Smith's lost future earnings, because it was not given sufficient guidance on Smith's employment history, his life expectancy, inflation or discounting to present value. Finally, Kaiser contends that the jury was not adequately instructed that any amounts awarded as damages would not be subject to income taxation.

## II. DISCUSSION

### A. *Motion to Transfer*

■ We first consider the appellant's contention that the district judge abused his discretion when he refused to transfer this case to the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a) (1982). Kaiser notes that although Smith worked in the District of Columbia, he resided in Virginia and received all medical care rendered by Kaiser in Virginia. Kaiser is incorporated and has its principal place of business in the District of Columbia, thus the diversity jurisdiction of the district court was properly invoked. Kaiser, however, argues that the convenience of the witnesses and parties, as well as the interests of justice, compelled a transfer of this case to Virginia. Its arguments are not forceful. As the change of venue was merely from Washington, D.C. to Alexandria, Virginia, no witness or party was to be particularly convenienced by the move. Neither would the interests of justice be served, as District of Columbia law would continue to apply even if the case were moved to Virginia. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (where defendant seeks transfer, transferee court ordinarily is "obligated to apply the state law that would have been applied if there had been no change of venue").

### B. *Kaiser's Liability for its Independent Contractor's Negligence*

Next we examine Kaiser's appeal of the court's denial of Kaiser's motions for a directed verdict. When considering the denial of a motion for a directed verdict, we must look at all the evidence in the light most favorable to the non-movant and resolve all conflicts in the evidence in the non-movant's favor. *Bell v. May Dep't Stores Co.*, 866 F.2d 452, 455 (D.C.Cir. 1989). Bearing that standard in mind, we find insubstantial Kaiser's contention that it is not vicariously liable for the negligence of Sherber, its consulting physician, because he is an independent contractor.

■ To determine whether the requisite "master-servant" relationship exists between an employer and an independent contractor for the purpose at hand, *i.e.*, ascertaining whether the employer is liable for the independent contractor's negligence, the District of Columbia considers five factors: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer. Standing alone, none of these *indicia*, excepting (4), seem controlling...." *LeGrand v. Insurance Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968). An application of those factors to the instant case supports the conclusion that Kaiser is liable for Sherber's negligence. Sherber was brought in as a consultant by a Kaiser physician, so it cannot be gainsaid that Kaiser selected and engaged him. The record does not reveal who paid Sherber, so that point is inconclusive. It does, however, appear as though Kaiser could discharge Sherber from the Smith case, but as Sherber is an independent physician, this factor does not carry the same weight as it might if Sherber had no other source of income. As to the fourth and most important factor, Kaiser had some ability to control Sherber's behavior in that he answered to Smith's primary care-taker, a Kaiser doctor. Finally, as Kaiser provided health care and Sherber was performing health care (albeit negli-

gently) we may safely conclude that Sherber's actions fell within the ambit of Kaiser's regular business. It might be said that because Kaiser had eliminated cardiology from its coverage, the actions of Sherber, a cardiologist, do not fall within Kaiser's regular business offerings, but we think such an argument circumvents the intention of this final factor—to shield an employer from liability for the actions of an employee who was acting outside his field of expertise (for example, a doctor who negligently fixes a car)—and so we consider Sherber's actions to fall within the scope of Kaiser's regular business. Under the *LeGrand* analysis, we thus conclude, liability for Sherber's negligence attaches to Kaiser.

Although the District of Columbia has not explicitly opined on the question of when an independent contractor is an apparent or ostensible agent, we may draw added support from *Haven v. Randolph,* 342 F.Supp. 538, 542 (D.D.C.1972), *aff'd on other grounds,* 494 F.2d 1069 (D.C.Cir. 1974), which declared that a "hospital is liable for the acts of a physician only if he is employed by the hospital and/or acts as agent for the hospital." The district court held that sufficient evidence was presented to the jury to support the finding that Kaiser was liable for Sherber's acts under the theory that he was an apparent or ostensible agent. The *Haven* court stated that the doctrine of *respondeat superior* is *not* applied when "a physician ... acts upon his own initiative, and in the exercise of his own judgment and skill, without direction or control of an employer, * * * and [when] there is negligence in the treatment of a patient on the part of a physician who is not the servant or employee of the hospital, and who is pursuing an independent calling." *Id.* (quoting *Smith v. Duke Univ.,* 219 N.C. 628, 14 S.E.2d 643, 647 (1941)). By implication, the *Haven* court would apply *respondeat superior* here, where Sherber acted neither on his own initiative nor independently of the Kaiser physician. To the contrary, Sherber only made recommendations to the Kaiser doctor.

The *Haven* case seems to be the only decision on point applying D.C. law, but there is a sensibly-reasoned Maryland case which supports finding Sherber to be Kaiser's agent. In *Mehlman v. Powell,* 281 Md. 269, 378 A.2d 1121 (1977), the hospital was held to be responsible for its emergency room doctors even though they were independent contractors because patients who came to the emergency room reasonably expected—and were not disabused of the notion—that the doctors in the emergency room were hospital employees. In the instant case, Sherber was brought in by Kaiser to examine Smith who had every reason to believe that Sherber was Kaiser's agent.

Having thus satisfied ourselves of Kaiser's liability for Sherber's negligent treatment of Smith, we need not tarry over Kaiser's contention that no showing was made that it breached its contractual duty of care to Smith. The record is replete with such evidence.

### C. *Lost Future Wages*

#### 1. *Employment History*

■ Appellant challenges the lack of expert testimony presented to the jury for the purpose of calculating the lost-future-wages component of damages. Specifically, Kaiser contends that there was insufficient information presented to the jury on which to assess Smith's past and present earnings (from which future earnings might be extrapolated). Although appellant is correct in stating that the plaintiff does bear the burden of proving "the amount of ... damages suffered as a result of defendant's conduct," *Manes v. Dowling,* 375 A.2d 221, 224 (D.C.1977), it is incorrect in asserting that such damages must be shown by an expert, and that no evidence of lost future wages was given in the instant case. The record includes testimony by Smith's wife and his employer as to his work history, schooling, job and salary at the time of his death. In addition, there was testimony assessing his skill as an employee which suggested the likelihood of his being promoted. Expert testimony is not required to show this aspect of

lost future wages. "Not every element of damages warrants the use of expert testimony, and the decision to admit expert testimony lies within the sound discretion of the trial court." *District of Columbia v. Barriteau,* 399 A.2d 563, 568 (D.C.1979) (citing *Hughes v. Pender,* 391 A.2d 259, 262 (D.C.1978)). Due to the ample testimony regarding Smith's employment history and background, we do not find that the district judge abused his discretion in not requiring expert testimony to prove lost future wages.

## 2. *Life Expectancy*

■ Neither are we convinced that the district court erred with respect to its instruction concerning Smith's life expectancy. After much debate with counsel, the judge instructed the jury that Smith's life expectancy, according to the Health and Human Services Table of Mortality, was 23.6 years. Kaiser objects to this instruction because Schleier failed to produce a certified copy of the Health and Human Services Table. We note, however, that it was Kaiser that urged this figure before the district court. At trial, Schleier argued that Smith's life expectancy was 25 years. Under these circumstances we see no cause for Kaiser to complain.

## 3. *Inflation*

■ However, we are in accord with the appellant that the trial judge should not have told the jury that it may consider inflation, absent sufficient guidance. The District of Columbia Court of Appeals has indicated that it is not necessary that the jury take inflation into consideration in calculating a damage award, but if it does it must do so based on an adequate foundation and not on sheer speculation. "We hold that it is proper for the jury to consider the impact of future inflation in arriving at future loss of income in personal injury cases. We do not suggest by our holding that in all cases the jury should be allowed to consider inflation. *There must be a proper factual predicate in the record to support the jury's consideration of future inflationary projections. ... In short, there must be competent evidence*

*which sets the future rate of inflation within reasonable limits." District of Columbia v. Barriteau,* 399 A.2d at 568 (emphasis added). In the instant case the record evidence does not indicate that the jury was equipped to do anything but speculate with respect to inflation.

## 4. *Discounting to Present Value*

■ Appellant contends, and we agree, that in order for the jury to discount lost future wages to their present value, it needed expert guidance. The Court of Appeals for the District of Columbia has held that "when the subject dealt with is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman, its clarification calls for the use of expert testimony." *Barriteau* at 568–69 (quoting *District of Columbia v. Davis,* 386 A.2d 1195, 1200 (D.C.1978)). The formula for discounting lost future income to present value is complicated and not one that a jury would be likely to intuit. Although the judge twice gave the jury a pattern instruction explaining the concept of discounting to present value, the jury was not provided with any comprehensible guidance on how to discount to present value. We believe that discounting to present value falls within the class of tasks which "lend [themselves] to clarification by expert testimony because [they] involve[ ] the use of statistical techniques and require[ ] a broad knowledge of economics." *Barriteau* at 568 (quoting *Hughes v. Pender,* 391 A.2d at 262). D.C. courts have not considered the question which party has the burden of introducing such guidance into the record. We do not reach that issue, but leave it open for consideration by the district court, for we must vacate and remand for a new trial in any event because of the court's inadequate instruction on the income taxation of damages. *Compare Aldridge v. Baltimore & O.R.R.,* 789 F.2d 1061, 1067–68 (4th Cir.1986) (holding that defendant, as party with greatest interest in discounting to present value, has burden of providing jury with guidance), *aff'd,* 814 F.2d 157 (4th Cir.1987) (en banc), *vacated and re-*

manded sub nom. *Chesapeake & O.R.R. v. Aldridge,* — U.S. —, 108 S.Ct. 2812, 100 L.Ed.2d 913 (1988) (remanding for reconsideration in light of *Monessen S.W. Ry. v. Morgan,* — U.S. —, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988)), *with DiSabatino v. National R.R. Passenger Corp.,* 724 F.2d 394, 396 (3d Cir.1984) (plaintiff carries burden of presenting such evidence to jury).

### D. *Instruction that Damages are not Subject to Income Taxation*

■ The court declined Kaiser's request that the following instruction be given to the jury:

> Members of the jury, you are instructed that any award in favor of plaintiff which you may make in this action will not be subject to income taxation.

In *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 627 (D.C.1986), the District of Columbia Court of Appeals held that "in any case in which trial begins on or after the date of this opinion, the trial court should, upon request, instruct the jury that any damage award will not be subject to income taxation."[3] Having put the trial courts on notice of the propriety of such an instruction, the District of Columbia Court of Appeals, we believe, would overturn a damage award if the trial court refused to submit the proffered instruction. Appellee argues that *Psychiatric Institute* does not control the issue of damages in this case, as it is only D.C. law. Appellee is mistaken. Although the Rules of Decision Act, and hence *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), do not strictly apply with respect to D.C. law, we apply D.C.'s substantive law analogously for reasons of uniformity and respect for the D.C. Court of Appeals. *Anchorage–Hynning & Co. v. Moringiello,* 697 F.2d 356, 360–61 (D.C.Cir.1983). Furthermore, although it is a novel question for us, we think it proper to characterize instructing a jury on the question of income taxation of damages as substantive, not procedural; thus, D.C. law governs. In

*Nepera Chemical, Inc. v. Sea–Land Service Inc.,* 794 F.2d 688, 698–99 (D.C.Cir. 1986), we classified the imposition of punitive damages as "substantive." Similarly, this court in *Schneider v. Lockheed Aircraft Corp.,* 658 F.2d 835 (D.C.Cir.1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982), held that the assessment of prejudgment interest in a tort action was governed by D.C. law. The *Schneider* court relied on local law because "federal courts 'are not free to devise a different measure of damages pursuant to [their] "general equitable powers." ' " *Id.* at 855 (quoting *In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979,* 644 F.2d 633, 637 (7th Cir.1981)). In sum, we are satisfied that *Psychiatric Institute* controls this issue.

■ Apparently the district judge thought his initial instruction to the jury would suffice. In it he advised the jury that, with respect to Smith's earnings, it "must subtract ... whatever taxes [the deceased] would have been required to pay, and I will instruct you ... [on] the effect of what taxes he would have been required to pay." The instruction given by the district court was a proper one in that it provided the jury with guidance in determining the lost earnings that Smith's estate was entitled to recover. However, this instruction is distinct from the charge required by *Psychiatric Institute.* That District of Columbia Court of Appeals decision requires, if defendant so requests, an additional instruction which informs the jury that the entirety of its award is not subject to taxation as income to the recipient. Accordingly, we believe that the district judge erred in failing to so instruct.

### III. CONCLUSION

For the reasons stated, we conclude that the district court judge erred in refusing to instruct the jury that damages awarded to the plaintiff would not be subject to income taxation. In any retrial on damages in this case, an instruction to the jury to consider

---

3. The trial in the instant case began on October 13, 1987, well after *Psychiatric Institute* was

issued.

inflation, if one is given, must be accompanied by a framework within which the jury may properly account for it. Similarly, the jury will need expert guidance to properly discount the award to present value.

Accordingly, finding no reversible error in the determination of liability, we vacate the judgment only insofar as it sets damages and remand to the district court for a new trial of the amount appropriately awarded to plaintiff.

*It is so ordered.*