**Robert J. HICKEY, Petitioner,**

v.

**Mary BOMERS, Respondent.**

**Nos. 09–AA–551, 09–AA–808.**

District of Columbia Court of Appeals.

Submitted June 29, 2011.

Decided Sept. 29, 2011.

consider the implications of BFSC's status as an agent rather than an owner.

Robert J. Hickey, Washington, DC, pro se.

James R. Klimaski, Lynn I. Miller and John P. Racin, Washington, DC, for respondent.

Before THOMPSON, Associate Judge, RUIZ, Associate Judge, Retired,* and KING, Senior Judge.

---

* Judge Ruiz was an Associate Judge of the court at the time of submission. Her status changed to Associate Judge, Retired, on September 1, 2011.

Thompson, Associate Judge:

On February 16, 2009, respondent Mary Bomers, having been discharged from work as a legal secretary for petitioner Robert Hickey, applied for unemployment compensation benefits. The District of Columbia Department of Employment Services ("DOES") initially denied the claim on the basis of information provided by Hickey that Bomers had been an independent contractor rather than an employee. Bomers appealed that determination to the Office of Administrative Hearings ("OAH"). After a hearing on April 17, 2009, the OAH Administrative Law Judge ("ALJ") found in an order dated April 28, 2009, (in OAH Case No. ESP–112779–09) ("Final Order I") that Bomers had been an employee of Hickey and was eligible to receive unemployment benefits. Hickey petitioned to this court for review of that OAH order.

In the meantime, after DOES notified Bomers that she was qualified to receive benefits, Hickey filed a second petition for review by OAH, contending that even if, as OAH had earlier found, Bomers was eligible for benefits as a discharged employee, she did not qualify for benefits because she had been discharged for misconduct. After a hearing on June 12, 2009, the OAH ALJ found in an order dated July 9, 2009 (in OAH Case No. ESP–113273–09) ("Final Order II") that Hickey had "failed to prove, by a preponderance of the evidence, that he discharged [Bomers] for acts that are misconduct," and therefore concluded that Bomers qualified for benefits. Final Order II at 2. Hickey again petitioned for review by this court, and we consolidated the two petitions for review.

Hickey contends that the ALJ's finding that Bomers was an employee and her determination that Bomers was not terminated for misconduct are not supported by substantial evidence in the record. He contends that the ALJ's rulings that Bomers is eligible and qualified to receive unemployment benefits must be reversed. We affirm the ALJ's ruling that Bomers was an employee, concluding that it is supported by substantial evidence and comports with applicable law. We hold, however, that the ALJ's conclusion that Bomers was not discharged for misconduct does not flow rationally from the ALJ's findings and the supporting substantial evidence in the record that the ALJ credited, and therefore that the order awarding Bomers benefits must be reversed.

## I. Standard of Review

■ Our standard of review of OAH orders is as stated in *Morris v. United States Envtl. Prot. Agency,* 975 A.2d 176, 180 (D.C.2009): We "must affirm an OAH decision when (1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact." *Id.* (quoting *Rodriguez v. Filene's Basement, Inc.,* 905 A.2d 177, 180 (D.C.2006) (internal quotation marks omitted)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Chase v. District of Columbia Dep't of Emp't Servs.,* 804 A.2d 1119, 1123 (D.C.2002) (citation omitted). "Factual findings supported by substantial evidence on the record as a whole are binding on the reviewing court, although this court may have reached a different result based on an independent review of the record." *McKinley v. District of Columbia Dep't of Emp't Servs.,* 696 A.2d 1377, 1383 (D.C.1997) (citation omitted).

## II. The ALJ's Conclusion That Bomers Was an Employee

■ "When the relationship of a worker to a company is that of an indepen-

dent contractor rather than that of an employee as defined by the common law, that worker is not entitled to benefits under the District of Columbia Unemployment Compensation Act [the 'Act']." *RosExpress, Inc. v. District of Columbia Dep't of Emp't Servs.*, 602 A.2d 659, 661 (D.C.1992). Under the Act, "employment" is defined as service by "[a]ny individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an employee." D.C.Code § 51–101(2)(A)(i)(II) (2001). Under our common-law principles, "[w]hether one who performs work on behalf of another is an employee or an independent contractor depends on the particular facts of each case." *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 422–23 (D.C.2006). The factors that are "determinative of whether an employment relationship existed" are "(1) the selection and engagement of the individual hired, (2) the payment of wages, (3) the power of the one who hires over the other whom he has hired, and (4) whether the service performed by the person hired is a part of the regular business of the one who hired." *Spackman v. District of Columbia Dep't of Emp't Servs.*, 590 A.2d 515, 516 (D.C.1991). "While no single factor is controlling, the decisive test is whether the employer has *the right to control and direct the servant in the performance of his work and the manner in which the work is to be done.*" *Schecter*, 892 A.2d at 423 (internal ellipses and quotation marks omitted; emphasis in original); *see also id.* at 423 (emphasizing that "the right to control means the right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision" (citation and internal quotation marks omitted)). "In analyzing an employer's right to control, we look to the actual relationship between the parties and the language of any agreement between them, if any." *Id.* (citing *District of Columbia v. Hampton*, 666 A.2d 30, 38 (D.C.1995)).

"The determination of whether an employer-employee relationship exists involves a mixed question of law and fact." *Spicer Accounting, Inc. v. United States*, 918 F.2d 90, 92 (9th Cir.1990); *see also Gordon v. District Unemployment Comp. Bd.*, 402 A.2d 1251, 1258 (D.C.1979) (unemployment insurance coverage involves mixed questions of fact and law); *Carpetland U.S.A., Inc. v. Ill. Dep't of Emp't Sec.*, 201 Ill.2d 351, 267 Ill.Dec. 29, 776 N.E.2d 166, 177 (2002) (explaining that "whether certain workers are independent contractors under [the unemployment compensation statute] is ... a mixed question of law and fact"). We review mixed questions of law and fact "under our usual deferential standard of review for factual findings (applying either the 'clearly erroneous' or 'substantial evidence' standard of review) and [apply] *de novo* review to the ultimate legal conclusions based on those facts." *Scolaro v. District of Columbia Bd. of Elections & Ethics*, 717 A.2d 891, 894 (D.C.1998).

In this case, the ALJ made the following findings of fact regarding the employee/independent contractor issue: On January 16, 2006, Hickey, who has a solo law practice, hired Bomers as his legal secretary. Prior to hiring Bomers, Hickey had used an individual supplied through a temporary agency as his secretary. When Hickey and Bomers discussed her employment, they settled on an hourly rate of $18 per hour, which was less than the $24 per hour that Hickey had been paying to the temporary agency. At the time Bomers took the job, she knew that there would be no taxes taken out of her paychecks and that she would be filing quarterly tax returns with the IRS. Hickey believed that the relationship would be "advantageous to [him] be-

cause [he] was paying less than the agency fee" and also advantageous to Bomers "since she was receiving more than [the agency employee] had been paid through the agency." Final Order I at 3–4.

Hickey sublet two offices within a suite of offices owned by a business called Capitol Inquiry; he occupied one office and Bomers occupied the other, and the offices were not contiguous. Bomers's work schedule was 8:30 a.m. until 5:00 p.m. with a half-hour for lunch, Monday through Friday, although Hickey told Bomers several times that "she could work the hours that she pleased as long as she got the work done and he was billed only for the hours worked." Final Order I at 2. Bomers was paid twice a month on an hourly basis, and she submitted billing statements to Hickey that reflected the hours worked each day of the pay period. Hickey provided no benefits and paid no taxes for Bomers; she received IRS Forms 1099 for the years she was employed (2006 through 2008). Bomers prepared her own IRS Form 1099 for 2006 and 2007. On the office monthly financial forms, Bomers listed her salary under the category "contract compensation." Bomers also prepared Hickey's IRS Form 1040 for tax years 2006 and 2007, on which her salary was reported as a "contract labor" expense.

Bomers' job entailed a variety of secretarial duties, and Hickey "gave [Bomers] work assignments." Final Order I at 2.

Hickey did not use the computer, and Bomers' primary job was typing legal documents that Hickey drafted longhand. Bomers also answered the telephone, screened calls, prepared monthly financial reports, and performed other clerical duties, including preparing checks for Hickey's signature. During the time that Bomers worked for Hickey, she did not work for anyone else and she used his equipment when she worked.

In January 2009, Hickey informed Bomers by letter that he had "decided to replace [her] contract with another contract server immediately." Final Order I at 4. Bomers' last day of work was December 11, 2008.

■ The ALJ analyzed the foregoing factual findings (which Hickey does not contest) in light of the factors identified in *Spackman.* Final Order I at 6–8. Regarding Bomers' selection and engagement, the ALJ found that Hickey "hired Claimant directly" (rather than, for example, arranging for her services through an agency), *id.* at 7, a finding that is supported by the record and that weighs in favor of a conclusion that Bomers was Hickey's employee.[1] With regard to the second *Spackman* factor, "the payment of wages," the ALJ found that the facts that Hickey issued Forms 1099[2] to Bomers and "paid none of her taxes" "argue[d] in favor of finding" that she was an independent contractor.[3] *Id.* We agree with that as-

---

1. Both Hickey and Bomers testified that Hickey hired her after she "approached" him about filling the position vacated by his previous temporary-agency secretary. *Cf. Schleier v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.,* 876 F.2d 174, 177 (D.C.Cir.1989) (applying the first factor identified in *Spackman* and reasoning that the worker was "brought in by [one of defendant Kaiser's staff]," "so it cannot be gainsaid that Kaiser selected and engaged him").

2. A Form 1099 is commonly referred to as an "independent contractor's tax return." *Judah v. Reiner,* 744 A.2d 1037, 1041 (D.C. 2000).

3. The ALJ found that Bomers "filed her own quarterly tax forms with the IRS" and "knew that Employer was reporting her pay to the IRS as payment to a contractor since she filled out the relevant tax forms and prepared monthly financial reports, all of which reflected her pay as 'contractor' pay." Final Order I at 8.

sessment but also note that "use of a 1099 tax form does not [necessarily] undermine the conclusion that a worker is an employee and not an independent contractor."[4] In addition, we note that the ALJ's finding that Bomers was paid an hourly rate based on the hours she worked weighs at least slightly on the side of her having been an employee rather than an independent contractor. *Cf. Spackman*, 590 A.2d at 517 (upholding determination that petitioner was not an employee where evidence showed that "despite working varying hours of rehearsal and performance each week, [he] received the same weekly installment" of $500 per week).

The ALJ devoted her lengthiest analysis to the third *Spackman* factor, which she termed the "critical factor of the amount of control [that Hickey] exercised over Claimant." Final Order I at 6. The ALJ found that Hickey "gave [Bomers] tasks to accomplish—preparing monthly reports, preparing checks for his signature, [and] filing finished documents with the court"; that Bomers "d[id] not direct the course of her actions," and that Hickey "controlled [her] performance on a day-to-day basis." *Id.* at 6. These conclusions are supported by

Hickey's testimony that at the beginning of every week, he "would write up a list" of work to be done that week and "if something had to be done that week, I would say this has priority over the others...." Although the ALJ credited Hickey's testimony that he repeatedly told Bomers that she could pick her own works hours, Hickey's further testimony that Bomers "had to be there ... at least a portion of the [regular work] day" to get his work done indicates that Hickey reserved the right to control the time and place of Bomers' work, and thus supports a conclusion that Bomers was actually an employee rather than an independent contractor.[5]

Considering the fourth *Spackman* factor, the ALJ concluded that the typing, telephone answering and other secretarial services that Bomers performed were part of Hickey's regular business. Final Order I at 7. Citing *Penick v. Emp't Sec. Dep't,* 82 Wash.App. 30, 917 P.2d 136 (1996), the ALJ also took into account that Bomers had no separate business office and did not work for anyone other than Hickey. We agree that these facts support a conclusion that Bomers was Hickey's employee.[6]

---

4. *Northland Cas. Co. v. Meeks*, 540 F.3d 869, 874 (8th Cir.2008); *see also Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C.Cir.2001) (reversing judgment as matter of law that consultant was an independent contractor for wage law purposes even though evidence showed that the defendant employer "filed 1099 tax forms, rather than W–2 tax forms, for her").

5. *Cf. Spackman*, 590 A.2d at 517 (upholding determination that petitioner was an independent contractor of the Washington Opera where the evidence showed that the Opera "did not set rehearsal schedules and give stage directions to petitioner while he performed under the terms of the contract for his operatic performance").

6. *See Penick*, 917 P.2d at 144–45 (listing as "indicia of an independently established business" the facts that a "worker has [a] separate

office or place of business outside of the home" and "works for others"). Although not controlling, the "ab[ility] to continue in business even if relationship with alleged employer is terminated" factor discussed in *Penick* is helpful to our analysis; the fact of a worker's regular dependence on the discharging employer for her entire earned income is relevant to whether coverage of the worker comports with the purpose of the unemployment statute, which is to protect "against economic dependency caused by temporary unemployment and to reduce the need for other welfare programs." *Bowman–Cook v. Wash. Metro. Area Transit Auth.*, 16 A.3d 130, 134 (D.C.2011) (quoting *Washington Times v. District of Columbia Dep't of Emp't Servs.*, 724 A.2d 1212, 1216–17 (D.C.1999) (internal quotation marks omitted)).

While Hickey takes issue with the ALJ's finding that he "would not allow" Hickey to do some of her work at home, Final Order I at 3, and argues that "[t]here was no restriction on Bomers doing work outside the office," Petitioner's Brief at 14, he testified at the hearing that Bomers "didn't want to be contacted at home ... and ... was very emphatic about that." This testimony weighs against a conclusion that Bomers performed her work as part of an independent business rather than as part of Hickey's regular business.

As already described, the ALJ recognized that Bomers "knew there would be no taxes taken out of her paychecks" when she and Hickey discussed her employment and was responsible herself for preparing the forms that listed her pay from Hickey as "contract compensation." The ALJ also acknowledged Hickey's testimony about "the fact that [Bomers] knew she was an independent contractor from the beginning of the relationship." Final Order I at 9. The ALJ concluded, however, that the "label" the parties gave to the relationship was not determinative. Final Order I at 8. That conclusion was legally correct, as the intent of the parties is only one factor among many to consider when assessing the nature of an employer-employee relationship.[7]

Our review confirms that, in each aspect of her analysis, the ALJ applied the correct legal principles. We discern no error in her application of any of the *Spackman* factors, and while we agree with her that there was evidence that weighed on both sides of the employee versus independent contractor issue,[8] we also agree that the critical "right to control [the] employee in the performance of [her] tasks" factor supports a conclusion that Bomers was not an independent contractor, despite Hickey's intention to treat her as such. Accordingly, upon "consideration of all of the circumstances surrounding the work relationship,"[9] we affirm the ALJ's ruling that Bomers was an employee.[10]

### III. Termination for Misconduct *Vel Non*

 We now turn to a review of the ALJ's finding that Hickey failed to prove by a preponderance of the evidence that Bomers was terminated for misconduct. We review *de novo* OAH's legal conclusion

---

**7.** *Cf. Ky. Unemployment Ins. Comm'n v. Landmark Cmty. Newspapers of Ky., Inc.*, 91 S.W.3d 575, 581 (Ky.2002) (concluding that newspaper carriers, although designated as independent contractors in their employment agreements, were employees, since the newspaper company hired the carriers and controlled the nature of their delivery work and how it was performed); *Purchase Transp. Servs. v. Estate of Wilson*, 39 S.W.3d 816, 818–19 (Ky.2001) (holding that where radio cab company set the decedent's schedule, dispatched all her calls, and set the rates she could charge to customers, the decedent was properly deemed to have been an employee, despite an agreement that clearly intended to create an independent contractor arrangement).

**8.** As we have frequently observed, findings may be supported by substantial evidence "even if there is substantial evidence to support a contrary conclusion." *Castro v. Sec. Assurance Mgmt., Inc.*, 20 A.3d 749, 756 (D.C. 2011).

**9.** *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C.Cir.1979).

**10.** Although we have relied on the *Spackman* factors in reaching this conclusion, we note that a conclusion in favor of Bomers' coverage under the unemployment compensation program comports with the principle that "the unemployment compensation statute is to be 'liberally construed to accomplish its purpose and extend its coverage, with a consequent strict construction of exemption provisions.' " *Brannum v. District of Columbia Pub. Sch.*, 946 A.2d 962, 966 (D.C.2008) (citation and internal brackets omitted).

about whether a terminated employee's actions constituted misconduct. *Badawi v. Hawk One Sec., Inc.*, 21 A.3d 607, 613 (D.C.2011).

At the evidentiary hearing, Hickey asserted that he had fired Bomers for a variety of reasons. In her Final Order, the ALJ discussed these under the headings "Fraud" (related to Bomers' having allegedly billed Hickey for time when she was out of the office and not working, and to her claiming "employee" status when she applied for unemployment benefits); "Claimant's Inability to Perform Duties"; alleged "Harassment"; and "Absenteeism." Final Order II at 8, 9. The ALJ found that fraud and inability to perform duties "were not factors in [Hickey's] decision" to terminate Bomers, *id.* at 9, and that Hickey's testimony indicated that harassment also "was not the basis for firing [Bomers]."[11] *Id.* at 10. The ALJ found that Hickey did terminate Bomers for "absenteeism" and that this was an independent basis for the termination decision,[12] but that Bomers' "absenteeism" did not amount to misconduct. *Id.* at 9, 12, 13.

We are satisfied that substantial evidence supports the ALJ's conclusions that alleged fraud, inability-to-perform-duties, and harassment were not the grounds for Bomers' termination.[13] However, we cannot sustain the ALJ's determination regarding Bomers' conduct that the ALJ referred to as "absenteeism."[14] We con-

11. The ALJ cited the principle that "[a] prerequisite to the denial of benefits in a misconduct case is that a finding of misconduct must be based fundamentally on the reasons specified by the employer for the discharge." *Brown v. Corr. Corp. of Am.*, 942 A.2d 1122, 1124 (D.C.2008). We have instructed that "[t]he ALJ must determine whether the particular reason given by the employer was in fact the basis of the employer's decision to fire the employee." *Id.* (internal quotations omitted).

12. *See Brown*, 942 A.2d at 1124 ("[W]hen the employer states more than one reason, the ALJ must ascertain whether *each* reason was an independent ground for the firing, or whether all of the reasons *together* constituted the critical mass justifying discharge.") (internal quotations omitted).

13. As to alleged fraudulent billing, the ALJ found, consistent with the evidence, that Hickey had "been tolerating Claimant's billing practices from her date of hire" and that he "was always free to examine her bills and question them specifically .... [but] did not do so." Final Order II at 8–9. The ALJ also found, consistent with the record, that at the time Hickey discharged Bomers, "there had been no finding that, under the Act, [Bomers] was an employee rather than an independent contractor" and therefore Hickey "could not have based the January 2009 discharge on reasoning that he would have paid her less beginning in January 2006, if he had known that, when applying for unemployment compensation benefits, [Bomers] would claim to be an employee rather than an independent contractor." Final Order II at 8. As to the claim that Bomers was discharged due to her "inability to perform duties," we note that the termination letter told Bomers that there might be "limited part time work available in the future," a statement that undermined Hickey's claim that ineptitude was a factor in his decision to fire Bomers.

Regarding Bomers's alleged sexual harassment of Capitol Inquiry's receptionists, the ALJ referred to Hickey's testimony that he warned Bomers that if there was a repeat of the type of incident alleged to have occurred on December 10, 2008, Hickey would fire Bomers immediately. While Hickey testified that he learned of a second incident "in January at some point," he did not testify that he learned of it before terminating Bomers on January 11, 2009. Thus, the ALJ did not clearly err in finding that Hickey "learned of that incident after he had fired Claimant." Final Order II at 10. Moreover, there is no indication in the record as to whether the second alleged incident occurred after Hickey warned Bomers in the wake of the first reported incident.

14. The ALJ made several factual findings pertinent to the issue of "absenteeism"; as will be seen, the term "absenteeism" does not entirely describe the conduct in issue.

clude that the ALJ erred in ruling that Bomers was not terminated for misconduct.

The ALJ found that the statements of days and hours worked that Bomers submitted for payment from December 16, 2007, through November 30, 2008, established that she "worked 181 days out of the 241 work days possible in that time frame." Final Order II at 3. Thus, the ALJ found, "Claimant's own statements indicate that she had missed a significant number of work days over the course of 2008," and she was "absent with increasing frequency starting in October 2008." *Id.* at 11. The ALJ also found that Hickey complained to Bomers that when she called to say that she would be absent from work, she did so by leaving messages late at night on Hickey's office voice mail. Hickey would "get the messages in the morning when it was too late to get a temporary secretary to cover for the day." *Id.* at 11. Hickey spoke to Bomers on December 10, 2008, and "itemized his concerns," telling Bomers that he "did not want to have the conversation again with her." *Id.* The next day, December 11, 2008, Bomers left work at noon and never returned. She called Hickey on December 12 and left a message on his office voice mail stating that she was either "in the hospital or going into the hospital." Bomers had unplanned surgery on December 13 and thereafter was hospitalized and then returned home for several weeks.[15] At the end of December, Bomers and Hickey spoke and Hickey asked Bomers to call him "on or about" January 8 ("the next Thursday after their conversation")[16] to discuss her return. *Id.* at 6, 11. However, Bomers did not call. *Id.* Bomers also "did not provide [Hickey] with any medical documentation of her illness or specific information about its nature." *Id.* at 6. This was information that Hickey asserted that he "needed to know . . . to evaluate whether . . . [Bomers] would return to work." *Id.* at 11. On January 11, 2009, Hickey sent Bomers a letter discharging her. The letter stated in pertinent part:

I was disappointed when you did not call me last Thursday to discuss your situation. I did receive the call you made late Friday stating you would not be working this week. From the content of that call it appears that you do not know when, if ever, you would be able to return to work, or that, even if you return, how long you would be able to continue to work.

You have now been away from work for over a month. This combined with other work absences and problems, has created a very undesirable situation for me. Accordingly, I have decided to replace your contract with another contract server immediately. . . .

It is possible that, there maybe [*sic*] limited part time work available in the future, particularly in assisting your replacement contractor.

I hope that your health improves soon.

---

15. The ALJ found that in mid-January, Bomers was again hospitalized for two weeks with an infection. Bomers testified that she "got home at the end of December [2008], . . . was home for a couple of weeks, and then . . . got an infection, and then . . . went back for yet another two weeks in the middle of January."

16. Hickey testified that after waiting nearly a month for Bomers "to come back and waiting for her to at least tell me I can come back X date," when he finally spoke with Bomers at the end of December, he told her that he needed to know when she was coming back and said to her, "[W]hy don't you give it a week, talk to your doctors, everybody, so I can plan?" Hickey testified that Bomers promised to call "on Thursday," January 8, but did not do so. Bomers testified that she did "not recall" whether she told Hickey she would call him on January 8.

In general, a terminated employee is presumed to be eligible for benefits. *Morris,* 975 A.2d at 181; D.C.Code § 51–109 (2001). However, "[t]hat presumption is rebutted, and the employee becomes ineligible for benefits, when the employer proves by a preponderance of the evidence that the employee was fired for misconduct." *Id.;* D.C.Code § 51–110. The unemployment statute distinguishes between "gross misconduct" and "misconduct, other than gross misconduct," also referred to as "simple misconduct." [17] "[I]mplicit in [the] definition of 'misconduct' is that the employee intentionally disregarded the employer's expectations for performance." *Bowman–Cook,* 16 A.3d at 135 (citation, internal quotation marks, and emphasis omitted); *see also Chase,* 804 A.2d at 1124 n. 12 (noting that a finding that the employee's misconduct was intentional "may be required even for a finding of simple misconduct"). To prove gross misconduct, "the employer must prove that the employee's actions were willful and deliberate." *Morris,* 975 A.2d at 182; *see* 7 DCMR § 312.3. Thus, for example, while "[a]ttendance at work is an obligation which every employee owes to his or her employer, and poor attendance, especially after one or more warnings, constitutes misconduct sufficient to justify the denial of a claim for unemployment benefits," "[t]he fact of absences or tardiness alone cannot suffice as proof of gross misconduct, without consideration of the bases for such absences or tardiness." *Id.* (citing *Shepherd v. District of Columbia Dep't of Emp't Servs.,* 514 A.2d 1184, 1186 (D.C.1986)). "This is so even if the absences or tardiness are repeated, although such a factor might be relevant in assessing the ultimate fact of wilfulness or deliberateness." *Id.* (citing *Larry v. Nat'l Rehab. Hosp.,* 973 A.2d 180, 183 (D.C. 2009)); *see also id.* ("Genuine illness that prevents an employee from coming to work negates the willfulness and deliberateness of her absenteeism, thereby preventing a finding of gross misconduct.").

In this case, the ALJ found that Hickey "failed to meet [his] burden to show that Claimant's absence from work after December 11, 2008, was deliberate rather than medically necessary" given that "Employer's discharge letter notes the problems her absence was causing him but does not accuse her of malingering." Final Order II at 12. The ALJ therefore concluded that Bomers was not discharged for "gross misconduct." The ALJ also addressed whether Bomers' conduct constituted "simple misconduct" and concluded that it did not. She reasoned that Bomers' absences did not "adversely affect[ ] a material employer interest," 7 DCMR § 312.5, since Hickey "did not argue that [Bomers'] services were difficult to replace." Final Order II at 13. The ALJ also reasoned that Hickey did not

**17.** D.C.Code §§ 51–110(b)(1) and (2). As defined in 7 DCMR § 312.3, "gross misconduct" is:

> an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee.

"Simple misconduct" on the other hand, is defined in 7 DCMR § 312.5 as:

> an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, [or] a breach of the employment agreement or contract, or which adversely affects a material employer interest. [Simple misconduct] shall include those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct.

argue that Bomers' absence "violated an Employer policy of which [Bomers] was aware," *Id.* (i.e., Hickey did not prove a "breach of the employment agreement or contract"). *Id.* The ALJ concluded that "[w]ithout some additional factor, . . . absences based on illness do not constitute simple misconduct." *Id.* She did not specifically consider whether Bomers' conduct "breach[ed] . . . the employee's duties or obligations to the employer." *Id.*

Hickey argues that the ALJ focused only on Bomers's absences—which Bomers claimed but never documented to be based on illness—and failed to take into account Bomers' "failure to provide evidence of her illness and when she could return to work, when requested by Hickey." He argues that this failure constituted "willful misconduct" or, at a minimum, "disregard of the employer's interest." He emphasizes that by January 11, 2009, the date when he sent the termination letter, "he still had not heard from [Bomers] or her doctor as to either [ ] her condition or when she would be returning to work." "[T]he relevant factor," he argues, is Bomers's "willful and deliberate action in refusing to provide any information on her illness or when she could return to work."

While we do not agree that Bomers' behavior amounted to gross misconduct,[18] we are persuaded that it did amount to simple misconduct and that the ALJ erred in concluding otherwise. The ALJ's analysis reflects an assumption that Hickey terminated Bomers because of her absence beginning in December 2008 (following on the heels of her "significant" absences earlier in 2008). Indeed, the ALJ concluded that "[t]he final incident precipitating [Bomers'] discharge was her absence beginning on December 11, 2008." Final Order II at 11. But that conclusion overlooks the ALJ's finding that Bomers "did not call" Hickey on the appointed date (January 8) to give him an idea about when he could expect her to return, and the undisputed evidence that Hickey terminated Bomers only after that omission and after Bomers failed to provide Hickey with any information about when she might return[19] (through a date-of-return estimate, or information about her illness from which he might estimate her return date, or a statement from her doctor about when she would be able to work again).[20]

18. Although Hickey complained that Bomers repeatedly failed to keep him informed (and thus at least arguably showed a "repeated disregard for the employee's obligation to the employer," 7 DCMR § 312.3, and a "substantial disregard of the employer's interest," *Hickenbottom v. District of Columbia Unemployment Comp. Bd.*, 273 A.2d 475, 478 (D.C. 1971)), because of the potential "mitigating circumstances" surrounding Bomers' unexplained illness, 7 DCMR § 312.5, we decline to hold that her conduct that precipitated the termination rose to the level of deliberateness and willfulness necessary to support a conclusion of gross misconduct. Her conduct also was far from the types of conduct listed in 7 DCMR § 312.4 as examples of gross misconduct (conduct including sabotage, assault or threats, arson, and theft).

19. Although the termination letter did refer to Bomers' having been "away from work for over a month," the letter also referred to "this combined with other work absences and problems," and the letter's introductory paragraph emphasized Hickey's disappointment at Bomers' failure to call him on the appointed date to discuss her situation and her failure to let him know "when, if ever" she would be able to return to work. Explaining his rationale, Hickey testified, "I felt at a minimum I was entitled to know exactly what her plans were;" "[s]he would never tell me what the nature of [the illness] was, how long she'd be gone;" "I wanted to know . . . what kind of ailment so I could look it up and see . . . whether you were going to come back."

20. Bomers told the ALJ that this information was "private" and that she would share it with the "[ALJ] if required," but no such information is included in the record.

Both in his testimony at the hearing (testimony that the ALJ appears to have credited) and in the termination letter, Hickey emphasized (1) Bomers's failure to timely advise him of expected absences (i.e., her leaving office voice mail messages late at night saying that she would not be in the next day, when it was too late for Hickey to arrange for a replacement secretary), and (2) Bomers' failure to give Hickey any idea about when she expected to return to work after her hospitalization (as to which she had given Hickey no documentation). Bomers acknowledged that she did not provide Hickey with "any doctor's certificate or statement indicating what [her] illness was, what [her] work situation would be, [or] when [she] could return to work." Hickey testified that Bomers' omissions led him to conclude that "I can't carry on like this," and to turn to a contract service for secretarial assistance.

We are constrained to agree with Hickey that, taken together, Bomers' repeated failure timely to (1) apprise Hickey about days of expected absence throughout her employment and (2) respond meaningfully to his request for information about the expected duration of her absence following her December hospitalization constituted a breach of Bomers' duty to Hickey as her employer, and thus constituted simple misconduct.[21] *See Morris*, 975 A.2d at 183 n. 6 (citing cases from other jurisdictions upholding a denial of benefits even though the employee has shown that her absence was due to sickness because the employee failed to notify the employer of his or her impending absence from work).[22] The ALJ's conclusion that Hickey failed to prove that he fired Bomers for misconduct does not flow rationally from the ALJ's factual findings and the supporting substantial evidence in the record that was credited by the ALJ.[23]

## IV. Conclusion

For the foregoing reasons, the Final Order in OAH Case No. ESP–112779–09, concluding that respondent Bomers was an employee rather than an independent contractor, is affirmed. The Final Order in OAH Case No. ESP–113273–09, concluding that Bomers was not terminated for misconduct and is entitled to unemployment benefits, is reversed.

*So ordered.*

---

**21.** Somewhat ironically, it may have been Bomers' understanding that Hickey did not intend for her to be an employee that accounts for Bomers' having behaved somewhat as her own boss—i.e., for her seemingly cavalier approach toward keeping Hickey informed about when and whether she could work.

**22.** *See, e.g., In re Ardito*, 254 A.D.2d 562, 563, 678 N.Y.S.2d 699 (N.Y.App.Div.1998) (reasoning that "[w]hile claimant testified that she continued to have medical difficulties following the expiration of her leave of absence, the record demonstrates that she nevertheless failed to contact the employer or have anyone else do so on her behalf"; and holding that the decision that she engaged in disqualifying misconduct was supported by substantial evidence).

**23.** Hickey has raised as an additional issue whether the ALJ erred when she stated that whether Bomers was in fact looking for work "was not relevant to disqualification." In light of the disposition we reach, we do not address the issue.