**THAI CHILI, INC., et al., Appellants,**

v.

**Prapeesuk BENNETT, et al., Appellees.**

**No. 11–CV–248.**

District of Columbia Court of Appeals.

Argued Feb. 16, 2012.
Decided Sept. 26, 2013.

Ronald K. Henry, Washington, DC, with whom Gregory T. Jaeger, North Brunswick, NJ, was on the brief, for the appellants.

Geoffrey Greeves, with whom Tab R. Turano, Washington, DC, was on the brief, for the appellees.

Before FISHER and BECKWITH, Associate Judges, and KING, Senior Judge.

BECKWITH, Associate Judge:

This case arises from a dispute over the ownership and control of two restaurants—Thai Chili and Sushi Go Round—located in Gallery Place in the District of Columbia's Chinatown neighborhood. Appellants Somchai Phongsvirajati and Chaveevarn Kawano (the Managers) are the former managers of the two restaurants. Appellees Neiyana Chotikul, Jeffrey Chotikul, Atit Phutilikit, Joanne Duangmanee, and Thanakorn Duangmanee (the Shareholders)[1] are investors in the closely held corporations controlling the restaurants, which operate as a single business venture but are separately incorporated as Thai Chili, Inc., and Miso Hungry, Inc. Not long after the restaurants opened for business in the summer of 2005, the Managers filed this lawsuit, alleging a hostile takeover by the Shareholders. The Shareholders

---

1. We refer to the appellants and the appellees as the trial court did—as "Managers" and "Shareholders," respectively—though the terms are imprecise in that all of the parties are shareholders in the restaurants. Paipan Asawareongchai and Prapeesuk Bennett, who are citizens of Thailand, were named as defendants in the complaint in this case, but were never served. Siriphen Thamvichai, who is the niece of appellant Somchai Phongsvirajati, was originally named as a defendant in the appellants' complaint and was also a party to appellees' counteraction in this case, but has since aligned herself with the appellants and is not participating in this appeal.

brought various counterclaims alleging a breach of fiduciary duty and seeking a determination of corporate ownership. After five years of combative litigation, Superior Court Judge Robert Richter ruled that the Shareholders held a majority interest in the companies by a slim margin.

On appeal, the Managers primarily contend that in reaching that decision, the court failed to conduct a proper de novo review, under Super. Ct. Civ. R. 53, of a lengthy Auditor–Master's report containing numerous evidentiary findings and conclusions of law that the trial court ultimately adopted. They also challenge the trial court's view of the facts on several central questions. We conclude that the trial court's review complied with Rule 53 and its factual findings were not clearly erroneous. We affirm the judgment of the Superior Court.

## I. Background

In the spring of 2004, Mr. Phongsvirajati and Ms. Kawano settled upon Gallery Place as a location for two new restaurants and filed articles of incorporation for the restaurants, naming Mr. Phongsvirajati as the sole director of each corporation and authorizing the issuance of 1000 shares of common stock, valued at one dollar per share.[2] Before the leases on the restaurant spaces were signed,[3] the Managers, who anticipated a $288,000 payment from the landlord to improve the rented space and who intended to invest $400,000 themselves ($300,000 from Mr. Phongsvirajati and $100,000 from Ms. Kawano), reached out to potential investors among their family, friends, and acquaintances and initially secured an additional $300,000 in pledged investments from Neiyana Chotikul and Atit Phutilikit, who each pledged $50,000, and Paipan Asawareongchai and Prapeesuk. Bennett, who each pledged $100,000.

The prospective total investment capital (not including the landlords construction allowance) was subsequently increased from $700,000 to $900,000 when in March of 2005, Ms. Kawano reported that an additional $200,000 was needed to allow the restaurants to open, and Neiyana Chotikul's children, Jeffrey Chotikul and Joanne Duangmanee, agreed to invest $50,000 and $100,000, respectively. Mr. Phongsvirajati also contacted his niece, Siriphen Thamvichai, who agreed to invest $50,000—money that eventually was invested in Ms. Thamvichai's name by Somchai Phongsvirajati's spouse.

Thai Chili opened for business on May 8, 2005. Later that month, Neiyana Chotikul, who had been named the restaurants' treasurer two weeks earlier at a shareholder meeting, gained access to the restaurants' bank statements, at which time she discovered that the Managers had yet to deposit their full capital contributions in the corporation bank accounts.[4] The following week, the Managers determined, after meeting with the contractor, that more money was needed in order to open Sushi Go Round. Neiyana Chotikul, who suspected that the unexpected deficit was attributable to the Managers' failure to make their lump sum payments, testified that "if you have $900,000 at April 23rd,

---

2. The articles of incorporation specified that shareholders in the corporations had a preemptive right to acquire additional shares.

3. Mr. Phongsvirajati executed leases for the restaurants on June 4, 2004.

4. Ms. Chotikul testified that when she questioned Mr. Phongsvirajati about this, he told her that he made his payments through credit card purchases rather than by direct deposits as the other investors had done. Ms. Chotikul told him this practice was not what the investors had agreed upon and that he should have paid cash into the corporate accounts and reimbursed himself for any restaurant-related purchases.

the restaurant doesn't have [a] problem." Joanne Duangmanee agreed to deposit an additional $50,000 on July 22, 2005, raising the total invested and anticipated capital to $950,000.[5] The crisis was averted and Sushi Go Round opened for business on August 8, 2005.

Not long thereafter, things went very wrong. In October of 2005, some of the Shareholders, frustrated with the failure of the Managers to issue shares and with perceived improprieties in the management of the businesses, took steps to gain more control over the day-to-day operation of the restaurants. The Managers challenged these actions by filing a lawsuit, and though the Shareholders quickly relinquished their temporary control of the restaurants, they filed a counterclaim seeking a determination of the ownership percentage in the restaurant corporations to which each party was entitled.[6] On July 26, 2007, Superior Court Judge Judith Retchin referred the matter to an Auditor–Master for an accounting of the parties' capitalization and of the restaurants' income and expenses. Between June 2008 and January 2009, the master held twenty-three days of evidentiary hearings, taking testimony—much of it translated from Thai—from the Managers, the Shareholders, and accountants hired by both sides to examine the restaurants' financial records.

The heart of the Managers' claims before the master was that Somchai Phongsvirajati and Chaveevarn Kawano together had acquired a majority interest in the restaurants through a combination of directly deposited investment capital and numerous cash and credit purchases they made to get the restaurants up and running. They contended that there was no limit on the capital contributions Mr. Phongsvirajati could claim, and that between his cash deposits and purchases and the value of certain liabilities he had incurred, he had invested substantially more than the $300,000 he had pledged. The Managers also contended, somewhat contradictorily, that Ms. Kawano had a subscription-for-shares agreement, such that $20,000 she deposited into the corporate account on December 12, 2005, well after the start of litigation in this case, should still count toward her capital credit.

The Shareholders countered that the parties had agreed that the total capital contribution by all parties was limited to $950,000, which they believed was the approximate cost of opening the restaurants for business. In the Shareholders' view, the Managers could contribute no more than the $400,000 they had pledged, or 42.1 percent of the investment capital, and in any event they had not even contributed that much, as Mr. Phongsvirajati had only deposited $260,000 of his pledged $300,000 and Ms. Kawano had only deposited $80,000 of her pledged $100,000 for a total of $340,000. The Shareholders also claimed that the Managers had misappropriated corporate revenues for personal purposes and to fund other business ventures.

The master's task was thus to determine whether there was a binding agreement among the parties to invest in the restaurants and issue shares, what its terms were, what actual contributions were made by Mr. Phongsvirajati and Ms. Kawano,

5. Somchai Phongsvirajati agreed to contribute $30,000 in cash to help make up the deficit, but there is no record of his deposit.

6. The Managers' complaint, filed in Superior Court on October 25, 2005, requested declaratory relief against several of the Shareholders and a temporary restraining order preventing the Shareholders from entering into the restaurants and holding themselves out as partners of the businesses. After the Shareholders returned daily control over the restaurant to the Managers, the request for a temporary restraining order was denied.

and how shares were to be apportioned among the parties given their respective contributions. In trying to resolve this dispute, the master sifted through a heap of documents, heard testimony over several months, and made dozens of findings in a fifty-six page report. We highlight here the findings most central to his resolution of this case—findings that focused heavily upon two meetings of the shareholders on April 23 and October 16, 2005, and upon various writings produced by the parties.

With respect to the first official shareholder meeting on April 23, 2005, the master found that all of the investors present—which was everyone except Jeffrey Chotikul and Joanne Duangmanee—recounted their respective anticipated contributions to what was at that point a $900,000 capitalization fund, while Ms. Kawano wrote down this accounting. The document listed Mr. Phongsvirajati's contribution as $300,000 and Ms. Kawano's as $100,000, though unlike the Shareholders, neither of the Managers had actually contributed the amounts written next to their names. Paipan Asawareongchai also created a document verifying that the parties elected Mr. Phongsvirajati as president and chairman of the two corporations, Ms. Kawano as vice-chairperson, and Neiyana Chotikul as treasurer, and that they had agreed that each investor would have the chance to purchase any shares offered for sale before they could be sold to an outsider. This document also indicated the parties' agreement that when the landlord paid the construction allowance, $100,000 would be available as shares for the employees and $50,000 would be available for the manager or "right-hand man." The master further found that Mr. Phongsvirajati did not mention that he had already issued shares to himself and Ms. Kawano, and that when the Shareholders inquired at this meeting as to when shares would be distributed, he responded that no shares would issue until he had added up all of his

receipts. Though the Managers contend this meant the Shareholders agreed he could contribute more than his pledged $300,000, the master found that there was "abundant evidence to support the finding that the addition of his receipts was needed to confirm the $300,000 pledge."

The master found that weeks later, in a July 11, 2005, email to Paipan Asawareongchai, Neiyana Chotikul described the Managers' anger when she urged them to register the investors' names in the corporation promptly, rather than after construction was completed, noting "I have explained to them so many times that capital investment is still the same $900,000. If we have to increase the capital we should notify all shareholders."

The master also made findings based upon testimony he heard regarding a final shareholder meeting on October 16, 2005, after both restaurants were open. As will be discussed *infra*, although the participants taped the meeting, which was conducted in Thai, the master made these findings without the benefit of the translated transcript that the parties later produced. With the exception of Paipan Asawareongchai and Prapeesuk Bennett, who authorized Neiyana Chotikul to act on their behalf, the Managers and Shareholders all attended. The master found that everyone present helped prepare a document that they understood was intended to confirm each investor's contribution. At this time, the Shareholders had all deposited capital contributions in the precise amounts listed on the sheet, while the Managers had not. The master found that at this meeting, the Shareholders repeated their demands that shares be issued, that Mr. Phongsvirajati told them that he would deliver the list to the restaurant's attorney so shares could issue, but that Mr. Phongsvirajati again said no stocks

would issue until he added up all of his receipts.

Finally, the master made several findings regarding a January 5, 2006, letter the Managers' attorney sent to the Shareholders after the start of litigation, purporting to issue shares to each of them. The letter indicated that the initial shares issued to Somchai Phongsvirajati and Chaveevarn Kawano had been cancelled and that shares had been reapportioned as follows: 4 percent to those who invested $50,000; 8 percent to those who invested $100,000; 12 percent to Chaveevarn Kawano, reflecting a capital investment of $150,000; and 44 percent to Somchai Phongsvirajati, based on a capital investment of $558,631.88. Mr. Phongsvirajati and Ms. Kawano's investment capital included $100,000 credits to each of them that they claimed the Shareholders had agreed to give them based on compensation for tasks performed and liabilities incurred in starting the restaurants.[7] The letter stated that the Shareholders could immediately claim their shares if they agreed to the percentage ownership breakdown put forth by the Managers. The Shareholders did not accept this arrangement, the Managers abandoned their specific claims to the $100,000 capital credits, and the litigation in this case continued.

## A. The Auditor–Master's Conclusions

A year after presiding over the final hearing, the master produced his report containing these findings, concluding primarily that 1) there was a binding and enforceable subscription-for-shares agreement among the parties to contribute a total capitalization investment of $950,000 to the restaurants—a figure roughly equal to what it cost to get both restaurants open for business when supplemented by the landlord's construction allowance; 2) the parties agreed that each investor was to receive a number of shares proportionate to their percentage contribution to the capital investment; 3) given this agreement and the actual capital contributions made by the parties, the Shareholders' aggregate ownership percentage by share came to 52.63 percent while the Managers' was 47.37 percent.

The master largely rejected the Shareholder's various claims of malfeasance and breach of fiduciary duty against the Managers and largely credited the Managers' testimony whenever they claimed disputed funds were spent on legitimate business expenses. The master did determine, however, that some of the Managers' claimed capital contributions were invalid for one reason or another, generally because they had already reimbursed themselves for purchases from company funds or because they had made the claimed expenditures on behalf of other restaurants they owned. The master ultimately found that in addition to the $260,000 Somchai Phongsvirajati directly deposited into the corporate accounts, he had invested an additional $59,505.86 towards the capitalization of the restaurants through his personal assets.

The master's conclusion that there was an August 8, 2005, cutoff date for contributions—the date the second restaurant opened—meant that even if the master concluded that the $20,000 contribution Ms. Kawano made after the start of litiga-

---

7. Chaveevarn Kawano's claimed capital investment of $50,000 cash, plus a $100,000 credit, inexplicably does not account for the actual cash she had deposited into the corporate account: $80,000 before the start of litigation, plus an additional $20,000 afterwards.

As the Managers later rescinded this claimed credit, the discrepancy remains unaccounted for. In their brief on appeal, the Managers now claim that the "correct total" for Ms. Kawano is $150,000.

tion in this case came from her own assets, her total contribution was still $80,000 rather than her intended $100,000 investment because she made the deposit into the corporate account months after the cutoff date. And the master's conclusions that there was a $950,000 limit on capitalization and that investors were limited to their pledged contributions meant that Mr. Phongsvirajati could not claim as part of his contribution that amount of the additional $59,000 in valid expenses—approximately $19,000—that was over and above his $300,000 pledged investment. The master concluded that the sources of investment credit that he rejected would remain the property of the restaurants as damages for the Managers' actions.

### B. The Trial Court's Ruling on the Master's Report

Following the release of the master's report, the parties each filed multiple pleadings seeking to convince the trial court to adopt or reject the master's report. The Managers filed a sixty-four page pleading cataloging its objections to the report's conclusions of fact and law in 227 separately numbered paragraphs. The Shareholders asked the court to adopt the master's report in its entirety.

In the spring and summer of 2010 the trial court held several hearings at which the parties presented some new evidence—most notably, a transcript of the October 16, 2005, meeting that had been discussed with but never provided to the master. In March of 2010, the Managers retained new counsel who retreated from the Managers' opening request for a hearing on all of their objections and their indication of their "intent to submit evidence and provide testimony at the hearings for all objections." In July 2010, the Managers submitted a more focused list of objections, citing five overarching issues involving the master's findings regarding 1) the $950,000 capitalization cap, 2) the amount of Chaveevarn Kawano's capital contributions, 3) the amount of Somchai Phongsvirajati's capital contributions, 4) the amount of Mr. Phongsvirajati's nonmonetary contributions, and 5) the director's authority to take certain actions. At a hearing on August 17, 2010, the parties staked out their final positions before the court on this new set of objections.

On September 2, 2010, the trial court issued an order adopting the master's findings. In doing so, the court confirmed that despite the absence of formal contracts or written agreements, and despite a general disregard for the laws governing corporate structure and financing, the parties had entered into a legally enforceable joint venture to fund and open the restaurants, and the Shareholders held a majority stock interest in this venture.

## II. Analysis

On appeal, the Managers level a broad-based challenge to the trial court's ruling in this case. They allege errors of law based upon the trial court's failure to conduct a proper de novo review of the master's findings and its failure to specifically resolve each of the original objections it submitted before new counsel presented a winnowed down set of objections to the master's findings. The Managers' challenges to the trial court's factual determinations primarily revolve around the Managers' insistence that the trial court either misinterpreted or failed to give effect to the transcript of the October 16, 2005, shareholder meeting—a transcript that in the Managers' view holds the key to most of the disputed issues in this case, such as the $950,000 capitalization limit and the determination that Ms. Kawano's and Mr. Phongsvirajati's capital contributions totaled $100,000 (minus $20,000 she invested too late) and $319,000 (capped at $300,000), respectively.

We review the trial court's legal conclusions de novo. *Hickey v. Bomers,* 28 A.3d 1119, 1123 (D.C.2011). We review its findings of fact for clear error. *Id.*

## A. The Level of Review Accorded to the Auditor Master's Findings

██ The Managers' principal argument is that the trial court ran afoul of Super. Ct. Civ. R. 53, which states that the court "must decide de novo all objections to findings of fact made or recommended by a master[.]" The crux of the Managers' argument is that the court explicitly signified that its review was *not* de novo when it stated in its September 2, 2010, order that it had "accorded deference to the credibility determinations of the [master]."

Notwithstanding the court's passing statement, the record is replete with indications that the court understood the appropriate standard and conducted the requisite de novo review. At one of several hearings it held prior to adopting the master's findings in this case, the trial court made explicit its understanding that de novo review "require[s] a review of the decision without any presumption of correctness." [8] And in its written order, besides quoting Rule 53 at length in its description of the standard of review—including, specifically, the language that "[t]he court must decide de novo all objections to findings of fact made or recommended by a master"—the court repeated this requirement, stated that it had reviewed the pertinent parts of "[t]he entire transcript and records of the [master] proceedings," explicitly noted that it had "carefully considered each of the [Manager's] objections" and "carefully read the transcript" of the October 16,

2005, shareholder meeting, and ultimately concluded, "on de novo review" and "[a]fter granting the Managers full opportunity to challenge" the master's findings, that it agreed with and adopted those findings. These comments, combined with the almost offhand quality of the trial court's reference to the master's credibility findings, create no concrete sense that the trial court actually deferred to any significant credibility finding.

██ And in any event, even if the master's credibility findings colored the trial court's appraisal of the questions before it, we do not read Rule 53 so strictly as to require the court to hear live testimony from every witness whose statements are contradicted by other witnesses or whose credibility is subject to challenge. We read it to require the court to provide the parties an opportunity to be heard regarding the master's findings and to "decide de novo" all objections to the master's factual and legal findings. In stating that the court *"may* receive evidence," Super. Ct. Civ. R. 53(g) (emphasis added), the rule contemplates that the trial court will inevitably adopt some factual findings that hinge at least in part upon the master's judgments about the credibility of witnesses who testified before him but not before the trial judge.

In this regard, the Shareholders' reliance upon *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), is apt. In that case, which involved a due process challenge to a procedure under the Federal Magistrates Act allowing a magistrate judge to rule on a criminal defendant's suppression motion, the Supreme Court held that a district court

---

8. Subsequently during this discussion, the Managers' counsel stated that under the review envisioned by Rule 53, if the judge had some questions about a particular finding or conclusion, he was "more or less obligated to conduct [his] own research into it[.]" The judge agreed, stating that if he had concerns about a particular finding, "that would leave open the possibility of taking more evidence[.]"

could accept a magistrate judge's credibility determinations without holding a new evidentiary hearing. *Id.* at 680–81, 100 S.Ct. 2406; *cf. also Geras v. Lafayette Display Fixtures, Inc.,* 742 F.2d 1037, 1044 (7th Cir.1984) ("A requirement of a new hearing would obviously defeat the purpose of the reference to a magistrate."). In so holding, the Court explicitly stated that the situation was "comparable to a special master's findings[.]" *Id.* at 680, 100 S.Ct. 2406.

As the Supreme Court suggested in *Raddatz* and made clear in the subsequent decision of *Peretz v. United States,* 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991), the efficacy of such a system of review depends to some extent upon the parties singling out any testimony that raises credibility concerns. *Peretz,* 501 U.S. at 939, 111 S.Ct. 2661 (deeming it significant that the petitioner in that case did not ask the district court to review any particular ruling of the magistrate and stating that the Court "presume[d] . . . that district judges will handle such cases properly when they arise"); *Raddatz,* 447 U.S. at 680, 100 S.Ct. 2406 (noting the existence of "sufficient procedures to alert the district court whether to exercise its discretion to conduct a hearing and view the witnesses itself"); *see also Gomez v. United States,* 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (noting that a judge, "if troubled by [a magistrate's] credibility determinations . . . could rehear the witnesses"); *cf. United States v. Peacock,* 761 F.2d 1313, 1318 (9th Cir.1985) (stating that under *Raddatz,* to the extent "de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties").

In the present case, though the judge made clear at a May 5, 2010, hearing that "[i]f somebody feels it's essential on a particular point to hear additional evidence, I would consider that," and noted that "as a technical matter either side has a right to request it,"[9] the Managers did not ask the court to rehear the live testimony of any witness whose original testimony before the master they viewed as especially farfetched or trustworthy. Instead, the Managers agreed—after retreating from their initial vow to "provide testimony at the hearings for all objections" to the master's report—that the judge could "rule from the record" "[a]s long as it includes a full consideration of what was said at the October 16 meeting." From that point, the Managers' approach focused singularly upon the transcript of the October 16 shareholder meeting, and instead of casting doubt upon any particular testimony before the master, the Managers characterized the October 16 transcript as "the final word" that would make everything else clear. As the Managers' counsel put it, "considering anything else before that was in essence just considering a draft iteration of the findings." Given the Managers' portrayal of the discrete question before the trial court and given their decision to decline the court's invitation to address any persisting credibility disputes with additional live testimony, we are not persuaded that the trial court's review of the master's findings failed to comply with Rule 53.

■ Relatedly, we disagree with the Managers' claim on appeal that all of those objections from among the original set that the trial court did not specifically resolve in its order were still pending. As the

---

9. The court also stated that it would inquire again later how the parties "want me to resolve this, whether you want to do it on the papers, whether you want to do it in court, whether there is a need to have any testimony taken. In other words, I want to have a proceeding that both sides [feel] comfortable with."

Managers now explain it, their second pared-down set of objections was intended solely as an alternate path to a decision in the Managers' favor, and unless the trial court accepted the Managers' analysis of the October 16 transcript and accordingly rejected the master's foremost findings, it was bound to address all of those objections and to issue findings on each one.

The record suggests otherwise.

In its September 2, 2010, order, the trial judge described his understanding of the matters before him on review like this:

> Initially, the Managers sought a full rehearing of the issues with the witnesses repeating the testimony given before the [master]. After a change in counsel in March, 2010, the Managers have modified this position. They submitted a second compendium of objections and agreed to a decision based on the existing record.

The court made clear that "the existing record" included what the Managers most cared about: the transcript of the October 16 meeting of the restaurants' investors. The court's interpretation of the task before it squares with what the parties seemed to contemplate at the hearings leading up to the trial court's order. By the time the court heard the last arguments before issuing its ruling, the Managers had deliberately—and seemingly strategically—limited their legal and factual claims to the streamlined version of their challenges on which the trial court ultimately ruled.

When, for example, it was time for the judge to hear the parties' substantive arguments regarding the master's findings, and when the judge invited any testimony the parties deemed necessary to resolve any credibility disputes, the Managers' counsel explained his intent "to winnow down the present objections," to "really laser in on what is important to us all in this case," and to "laser in on what's really at issue here." He steered the trial court toward a targeted set of issues in order to make things "more manageable." He proposed this because it was "in the Court's interest and in all of our interest and the corporation's interest." And given that their new objections let the Managers highlight the October 16 transcript—something that the original objections did not even address and that the Managers only later came to view as pivotal—we can see why the Managers viewed it as in the corporations interest.

On May 5, 2010, the court's understanding of what the Managers intended was clear: "And your new objections will displace the old objections." And at the August 17, 2010, hearing—the last hearing before the trial court issued its order adopting the master's findings—the judge similarly stated that "[a]t least I don't feel like there's hundreds of contested issues at this point," that the Managers had "commendably narrowed this dispute down in these pleadings," and that "procedurally you're both in agreement"—"I have enough in here to issue a decision." The Managers' counsel again made clear that the pared-down objections allowed the judge to focus upon the thing that mattered most to the Managers: the October 16 transcript. Thus, "[a]s long as it includes a full consideration of what was said at the October 16 meeting," the Managers "agree[d]" that the judge could "rule from the record in front of [him]."

Throughout the final hearing, it was clear to the parties that the next step was for the court to resolve the case and to issue "a declaration ... as to who owns what." At no point during the hearings before Judge Richter did counsel indicate that the Managers expected a full-blown hearing on all of the original objections that were left out of the second set of objections in the event the court did not

rule in their favor.[10] Instead, counsel distanced himself from the prior counsel's approach, stating, for example, that his firm was "brought in[ ] to change the dynamics, to bring a fresh perspective, to simplify things, to settle the case." Although the Managers' new counsel explained that the prior lawyers submitted hundreds of objections to the master's report because "[t]hey were trying to preserve arguments regarding everything," it is equally clear that the Managers' subsequent decision to "winnow that down" and "then provide sort of a final say of objections to that" and "laser in on what's really at issue here" was a strategic decision that the trial court correctly determined the Managers could not take back after the trial court adopted the master's findings.[11] *See Chatman v. Lawlor*, 831 A.2d 395, 405 (D.C.2003) (stating that a Rule 60(b) post-trial motion cannot be used to "rescue a litigant from strategy choices that later turn out to be improvident") (internal quotation marks and citation omitted).

While the Managers may not have formally abandoned any challenges lurking in their original objections,[12] given their final litigating stance at the court's last hearing, it is not plausible that the trial court would have proceeded under the terms the Managers now claim were in effect—that is, that the court would either reverse the master's findings based upon the Managers' view of the October 16 meeting and conclude that the Managers held a controlling interest of the restaurants or it would abort its review and revert to a full-fledged rehearing of the myriad original objections.[13]

## B. The Managers' Challenges to the Court's Factual Conclusions

The main points of factual dispute are whether the parties agreed to a limit on capitalization and what investment

10. On August 17, 2010, when the trial court asked, "But do you agree that that's really what I have to do here and that I don't need to make findings on hundreds of subsidiary issues?" counsel for the Managers did not disagree, and continued to emphasize the importance of the transcript of the October 16 meeting.

11. This conclusion is bolstered by the fact that after the court issued its order adopting the master's findings, the Managers filed two pleadings—a Notice of Motion for Clarification or Reconsideration on September 13, 2010, and an Opposition to Defendant's Cross Motion for Entry of Final Judgment on October 12, 2010—in which they registered no complaint about the court's alleged failure to issue a ruling on all of the original objections and made no mention of the court's statement that the Managers "submitted a second compendium of objections and agreed to a decision based on the existing record."

12. And indeed, as they stated in the Plaintiffs' Analysis of Objections to the Report of the Auditor–Master, filed in the trial court two months before the court's ruling, the Managers intended to "reserve their right, in accordance with [Rule] 53(g), to request an evidentiary hearing before this Honorable Court to present evidence and testimony in support of their objections, and to have those objections decided on a de novo basis."

13. Moreover, given the Managers' indication that they were winnowing their challenges down to the core of the case, that they were content to have the court rule from the record as long as it considered the October 16 transcript, and that they viewed "the other issues ruled upon by the Master" as "ancillary, at most," the court's consideration of the less compelling objections the Managers readily left out of their final set of challenges would be very unlikely to alter the landscape in any way. Similarly, in its order denying the Managers' motion to alter or amend the judgment, the trial court rejected the Managers' contention that they were entitled to "full-blown de novo hearings" "simply because the Court reached a conclusion with which they disagree," noting that reopening the case "would not alter the Court's ultimate decision about which side controls the majority interest in the restaurants."

amounts were attributable to Mr. Phongsvirajati and Ms. Kawano, as the Shareholders' overall contribution of $500,000 was undisputed. The Managers also contend that the trial court erred in its adoption of certain assumptions on the master's part regarding corporate control.

The Managers' primary contention is that the October 16 transcript on its face refuted the master's findings limiting the Managers' share to 47 percent of the whole—specifically, $300,000 from Mr. Phongsvirajati, $80,000 from Ms. Kawano, and $50,000 from Siriphen Thamvichai. As the Managers now view this transcript as the whole caboodle, they are at pains to explain something that may make it seem less so—namely, that they failed to tout it or even admit it into evidence in the hearings before the master. In now casting the master's failure to review the actual October 16 transcript as "inexplicabl[e]," [14] the Managers insinuate the master was at fault. But what was more puzzling was the Managers' own failure to submit a transcript to the master, [15] who, upon learning of its existence, immediately discerned its significance and pestered the parties for a copy. [16]

In any event, the trial court permitted the Managers to supplement the record with the transcript, reviewed several pleadings arguing its magnitude, listened to extensive oral argument regarding its importance, and fully incorporated its review of the transcript into its ruling, deeming it "highly instructive on many levels." The Managers now challenge the trial court's conclusion that nothing in the October 16 transcript undermined the master's findings.

█ We turn first to the Managers' challenge to the finding that the parties had agreed to determine ownership of the restaurants on a pro rata basis depending upon the investors' respective contributions to the $950,000 in total capital. [17] Our reading of all of the testimony heard by

14. The Managers have stated that "the Master erred in neglecting to pursue the October 16 meeting"; that he "wrongly failed to account for the recording of the October 16 meeting, despite knowing of its existence and importance"; that "the Master inexplicably never considered or reviewed a translation of the recording that the parties made of that meeting"; and that "it appears that, for unexplained reasons, the Master never reviewed a translation of the recording that the Shareholders made of that meeting."

15. The Managers point out that it was not uniquely their burden to provide the transcript. We do not suggest that the Managers waived their right to rely on the transcript: the trial court considered it, and so do we in our review on appeal. The Managers' decision not to press the content of the October 16 transcript before the master is nonetheless one of many factors informing our assessment of the trial court's findings about the October 16 meeting.

16. News of the existence of a tape of the October 16 meeting emerged at a hearing before the master in July of 2008. Once the master confirmed that the participants in the meeting knew the meeting was taped and that many were given copies of the tape, he made clear he wanted a transcript translated from Thai into English and he made clear he viewed it as "critical." He said that he "would like to have that transcribed" and that it "would be very probative as to the decision that has to be made on the percentages that are due the parties." Counsel for the Managers said, "[W]e'll provide the transcript." The following week, the master again inquired whether counsel had had "an opportunity to determine how long it might take to transcribe that meeting of October 16th, 2005?" The master was told that one of the Managers, Mr. Phongsvirajati, would send it to the Thai embassy for translation. Yet the first time the Managers produced a transcript of the meeting was two years later, months after the master issued his findings, when they attached a copy to the scaled down objections they filed in the trial court on July 2, 2010.

17. Specifically, the master found that "each of the parties had a binding and enforceable subscription for shares agreement, based upon the total investment of $950,000. The

the master and our review of both parties' translations of the October 16, 2005, meeting convince us that the trial court's adoption of the master's findings in this regard was not clearly erroneous.

Both sides highlight evidence supporting their positions. On the one hand, the Managers rely heavily upon the October 16 transcript, arguing, among other things, that it evinces an intent among the shareholders to count portions of the landlord's construction allowance as part of Mr. Phongsvirajati's and Ms. Kawano's capital contributions—$100,000 and $50,000, respectively. They further argue that opening the restaurants cost more than $950,000, that it was illogical for the master to recognize such a limit on total capitalization, and that the final costs of completing construction were not known even as late as the October 16 meeting. The Shareholders counter that the landlord construction allowance was used to pay the costs over and above the $950,000, consistent with the shareholders' understanding that it would not alter their pro rata shares.

The master's conclusion that the parties understood themselves as holding a proportionate share of a $950,000 investment has more than ample support and is the most reasonable interpretation of a large and complex record. Several aspects of the record are worth underscoring. Perhaps foremost, when the master sought to clarify whether Mr. Phongsvirajati was claiming any part of the landlord's payment as part of his capital contribution, counsel for the Managers indicated they were not claiming the landlord's payment "in any way in the itemized list of contributions that [Mr. Phongsvirajati] made." Moreover, as the master pointed out, neither of the Managers testified that they were claiming any proceeds from the landlord's contribution as part of their capital contribution, and indeed, there were many signs that this was not their belief.[18] For the Shareholders' part, a wealth of testimony indicated a collective expectation that they were owed shares for the percentage of the total capitalization that their contributions equaled.[19] This testimony was bolstered by the documents pro-

payments were to be deposited into the corporate accounts, and they were due promptly for the purpose of paying for the capitalization of both restaurants. No investments could be made in excess of $950,000 without the permission and participation of all of the Shareholders."

18. This includes Somchai Phongsvirajati's own statements. He testified before the master that shares would be distributed pro rata based upon the amount contributed to the total cost of construction and that neither he nor any other investor could simply invest more money when it was needed because he had to meet with the investors first and give everyone a chance "to invest additional money." He also acknowledged that the Shareholders were impatient about receiving stocks and that "they asked, they have invested the money but how come they did not get the stock certificate." In addition, the tax returns the Managers filed specifying that Mr. Phongsvirajati owned 32% of the stock and Ms. Kawano owned 11% were, as the master

noted, "extremely relevant as evidence that the Managers considered themselves, at least initially, bound to their investments of $300,000 and $100,000." So was the Managers' retreat from their claim—set forth in their counsel's January 5, 2006, proposed reissuance of shares that was straightaway rejected by the Shareholders—of a $100,000 credit for both Mr. Phongsvirajati and Ms. Kawano "as compensation for various tasks performed and liabilities undertaken during the first phases of the development of these restaurants." Filings the Managers prepared just prior to and during the hearings before the master providing an update of the capital they were claiming did not seek a capital credit for any portion of the landlord improvement funds.

19. These include, for example, Paipan Asawareongchai's testimony to this effect on June 6, 2008, confirming her belief that her share of the corporation would equal the percentage of the total investment that she had con-

duced during the April 23 and October 16 shareholder meetings reflecting the investors' respective contributions.

We disagree with the Managers' argument that the October 16 transcript made a contrary conclusion obvious. While Mr. Phongsvirajati made very clear at that meeting that he believed he deserved additional capital credit from the landlord's allowance, the Shareholders did not agree with him and their statements at the meeting echo the very different understanding of the agreement that emerged during the hearings before the master. Thanakorn Duangmanee, for example, reaffirmed the parties' understanding that if another round of capital was needed, then the shareholders had to agree "to do another round" as opposed to an individual shareholder just deciding they "want to put in $10,000 and shares increase and other people don't know." Similarly, when Mr. Duangmanee indicated that the amount of investments was agreed upon, Neiyana Chotikul chimed in that "everyone knew that," and Mr. Duangmanee said, "If it's done like this it's not a shareholder stake because it wasn't approved by most shareholders." [20]

Nor do we find clear error in the trial court's rejection of the Managers' broader assertions about corporate control. The Managers say the shareholders have "never been anything other than individuals seeking to purchase stock in the Corporations." They say that "[a]t issue here are corporations in which Appellants owned 100% of the shares and the question was how many shares could be given to Appellees in exchange for their cash contributions." The Managers' depiction of the corporations—and their claim that "Bill Gates of Microsoft and Mark Zuckerberg of Facebook" would be surprised to hear that founders of a corporation "gave up majority control simply because some newcomers put in more cash than the original shareholders"—might be more persuasive but for the facts that Neiyana Chotikul was involved at a very early stage of the restaurants' development and was made an officer, that the Managers had concealed from the Shareholders that they had issued stocks to themselves, that Mr. Phongsvirajati was aware of the Shareholders' impatience about the delay in issuing them stock, that the Shareholders had all made their lump sum investments promptly while the Managers did not,[21] and that there was abundant evidence that the parties intended to distribute shares under the terms found by the master and

tributed. They also include the July 11, 2005, email Ms. Chotikul sent to Paipan Asawareongchai in which she complained about the Managers' failure to "register the investor names in the corporation" and indicated her understanding "that capital investment is still the same $900,000" and that "[i]f we have to increase the capital we should notify all shareholders."

20. Siriphen Thamvichai, who was aligned with the Managers, commented that "[i]f there is someone that wants to sell their shares, they have to tell the other shareholders first; if no one wants it, then you can go outside." Neiyana Chotikul also noted during the meeting that Ms. Kawano had not made clear at the April 23 meeting that she would be making her investment in installments; she also recalled her surprise upon discovering that the Managers had not made lump sum capital contributions like everyone else, leading to a financial problem with the construction contractor.

21. As the master noted, "[i]ronically, at all times relevant to these proceedings, the Shareholders held the majority of the shares, since they were the only investors who promptly paid for their shares." Ms. Kawano "only made partial payments" and Mr. Phongsvirajati "always needed to prove a portion of his investment through a reconciliation of receipts." In the master's view, it was at least in part because of the Managers' failure to timely pay their pledges that the total investment had to be increased from $900,000 to $950,000.

adopted by the trial court. The record amply supports the master's finding that what the parties agreed to was a subscription-for-shares arrangement based upon a specific total investment.[22]

■ The Managers also argue that the trial court erred in limiting Mr. Phongsvirajati's contribution to $300,000, both by rejecting an additional $19,000 for expenditures on behalf of the restaurant that the master agreed were legitimate, and by denying him additional contribution—whether specifically tied to the landlord's allowance or, as the Managers now argue, conferred under a more general authority to determine the allocation of shares independent of cash investment—for his efforts (and those of the "right hand man") in getting the business started and managing it.

Even though Mr. Phongsvirajati formally deposited only $260,000 of his pledged $300,000 investment, the master, after weeks of hearings in which he painstakingly evaluated Mr. Phongsvirajati's many claimed expenditures, ultimately found that Mr. Phongsvirajati had made approximately $59,000 in legitimate purchases from personal assets as part of the capitalization of the restaurants.[23] Of that $59,000, however, the master only credited Mr. Phongsvirajati for up to $300,000, because "the Shareholders never agreed that [he] could invest more than $300,000" so he could not "claim credit for investments in excess thereof."

On appeal, the Managers challenge the master's finding that Mr. Phongsvirajati did not have the authority to increase his investment above his pledged limit. This conclusion affects the question whether Mr. Phongsvirajati should be credited for expenditures that went over the initially pledged $300,000 investment as well as the Managers' argument that Mr. Phongsvirajati should be credited for his nonmonetary contributions to the restaurants' startup, including guaranteeing the leases.

As we have already noted, there was considerable evidence that the parties agreed to capitalize the restaurant pursuant to the terms found by the master—that is, that each investor would promptly deposit the pledged amount, that the total capitalization was understood to be the funds needed to open the doors of the

---

**22.** While the Managers ardently contend that the record is sufficient to demonstrate the parties' intent to allocate shares sufficient to establish the Managers as majority shareholders, they also argue, in the alternative, that if there was not such an agreement, then there was no agreement at all, and the appropriate remedy was simply to refund everyone's money. As the trial court noted, there is some force to the contention that the conflicting evidence in this case shows a failure among the parties to meaningfully agree on anything. Despite signs of discord, however, we think the master and the trial court had a firm basis for ultimately gleaning from this record the basic agreement they both identified. Certain themes and expectations that appear again and again in the testimony, the documents, and even the October 16 transcript create a definitive sense of the parties' well founded belief that they had an enforceable subscription-for-shares agreement based upon a total investment. We also agree with the master that under the circumstances of this case—so notable for the extent to which it is lacking the sort of formal documentation one might expect to see when people put their money together and open a restaurant—the master had the authority to make the best determination he could based upon what evidence he had. *See, e.g., Young v. Delaney,* 647 A.2d 784, 790 (D.C.1994).

**23.** The master noted the "surprising number of expenditures" claimed by Mr. Phongsvirajati "that the Shareholders were able to disprove as the result of their detailed homework," primarily by showing that Mr. Phongsvirajati was presenting receipts for expenditures he made on behalf of other restaurants or by showing he was seeking credit for expenditures he incurred for his family members and relatives.

restaurant for their first day of business, and that no investments could be made in excess of the $950,000 without the permission and participation of all of the investors. The Managers argue, however, that the October 16 transcript provides emphatic evidence that Mr. Phongsvirajati was entitled to additional shareholding equity over and above the initially pledged $300,000.

We disagree that the transcript is clear cut in this regard. What *is* clear is that throughout the October 16 meeting, Mr. Phongsvirajati remained fixated upon his right to a portion of the landlord's construction allowance. But while the other investors expressed their appreciation to Mr. Phongsvirajati for all he did for the restaurants, and some even reassured him that he would be compensated for his efforts, they also resisted any formal allotment to Mr. Phongsvirajati of additional shares over and above the $300,000 he pledged. Mr. Duangmanee stated, for example, that "$150,000 is a big deal; it should have been discussed and approved," and restated his understanding that at the April 23 meeting, the investors in attendance had agreed that of the $250,000 landlord contribution, $100,000 would be added to the total investment and the remaining $150,000 would be given as a bonus to employees and "the right hand man." Mr. Phongsvirajati's only argument in support of his contention that the parties had agreed to increase his investment by at least $100,000 was that when he asked for it "no one disagreed or said otherwise" and "no one said anything."

Again, that the Managers declined any reliance upon this argument before the master is noteworthy. Although in his January 2006 letter to shareholders purporting to issue shares to each of the investors, the Managers' counsel credited Mr. Phongsvirajati and Ms. Kawano for additional nonmonetary contributions of $100,000 each, the Shareholders rejected this computation of shares and the Managers stopped pressing it. The October 16 transcript may show that some investors wanted to reward Mr. Phongsvirajati for his efforts on behalf of the restaurants, but there were sound bases in the record, as well as in the October 16 transcript, for concluding that they did not contemplate any increase in his capital investment or in the total that would be used to determine the value of everyone's individual investment.[24]

■ The Managers also challenge the trial court's conclusions regarding the amount of capital contribution properly attributable to Ms. Kawano. Specifically, the Managers argue that the trial court undervalued Ms. Kawano's contribution by $70,000 when it adopted the master's findings disallowing the $20,000 contribution Ms. Kawano made on December 12, 2005, and failing to credit Ms. Kawano for $50,000 that, in the Managers' view, the parties agreed would be allotted to the "right hand man."

As an initial matter, for many of the same reasons we uphold the trial court's adoption of the master's findings linking the capitalization limit to the projected amount of cash needed to open the restaurants, we see no error in the court's disallowance of the $20,000 that Ms. Kawano

---

24. Indeed, in their complaint in this case, the Managers characterized the money that they alleged was due to Mr. Phongsvirajati and Ms. Kawano from the landlord allowance in terms that suggest it was meant to be a cash bonus, not a capital contribution, stating: "The parties tentatively agreed to redistribute the corporate stock pro rata upon completion of construction and reconciliation of all capital contributions and a $150,000 cash payment to Phongsvirajati and Kawano" as compensation for setting up and managing the restaurants.

deposited into Thai Chili's account long after both restaurants opened and after the litigation in this case commenced.[25]

The $50,000 is a closer question. Undeniably, there is tension between the testimony presented to the master and what appears in the transcript of the October 16 meeting.[26] For several reasons, we do not find the trial court's rejection of the Managers' view of the $50,000 to be clear error. First, the trial court fully reviewed the October 16 transcript, reviewed the testimony before the master in light of the October 16 transcript, and determined the master's view of the $50,000 held up notwithstanding numerous references at the October 16 meeting to the parties' prior agreement that "the right hand man"— apparently Ms. Kawano[27]—would receive $50,000 of the landlord's expected contribution for her work in opening and operating the restaurants. The October 16 transcript does not make clear that $50,000 was meant to increase Ms. Kawano's total

investment in the restaurants, and there are many reasons to think it was not so intended.[28] Though the transcript contains some loose references to the $50,000 payment in terms of "shares," there are stronger indications that any such payment was intended as a cash bonus and was not meant to be capitalized. These include various references that do not identify it as capital and its repeated mention in tandem with the bonus to employees, which the parties' descriptions—such as Ms. Chotikul's statement that "we talked about how if a cook did a very good work, we would have given them a part of that $100,000 at the end of the year"— plainly cast as a cash reward to worthy employees. The $50,000 also was often referred to in juxtaposition to the amount of the landlord's allowance that *would* go to capital, such as when Mr. Phongsvirajati asked, "How is it that right hand man gets $50,000, employees get $100,000, $100,000 goes to capital and I get nothing?"[29] Fi-

**25.** Even aside from the payment's belatedness, the master "was not convinced that the investment did not come from corporate assets." Ms. Kawano's testimony before the master regarding the source of the $20,000 was vague, and though she linked it to the sale of her home, she was not sure whether she sold her home before or after Christmas of 2005.

**26.** At the hearings before the master, the $50,000 portion of the landlord's contribution the Managers now claim was intended to supplement Ms. Kawano's capital contribution was not a meaningful focus of the Managers' case. The transcript of the October 16 meeting, however, features several references to an agreement reached at the April 23 meeting of shareholders that Ms. Kawano was the "right hand man" and that $50,000 of the landlord's contribution was hers, though it was less clear whether it was intended to increase her total investment.

**27.** The Shareholders' suggestion that the "right hand man" was not Ms. Kawano is unconvincing, notwithstanding notes from the April 23 meeting more vaguely indicating that "right hand shares" are "for those who di-

rectly assist the company" and notwithstanding Paipan Asawareongchai's testimony that the identity of the right hand man was not made clear at the April 23 meeting. The October 16 transcript strongly suggests that the investors generally understood the "right hand man" to be Ms. Kawano.

**28.** Along these lines, the trial court stated to the Managers' counsel during the August 17, 2010, hearing that "all these things you're talking about that may or may not be capitalized aren't necessarily capitalized. And it's a question of, you know, does the evidence support . . . an agreement that these things would entitle a greater capital share."

**29.** At one point during the meeting, Ms. Chotikul recounted the understanding from the April 23 meeting, before Joanne Duangmanee invested the final $50,000 and the total investment was still $900,000, that of the $250,000, "$100,000 would go towards capital making total $1,000,000 investment." Mr. Duangmanee subsequently repeated that "$100,000 would be added to $900,000 making capital $1,000,000 and then [the] remaining

nally, the fact that the meeting occurred during a tumultuous time of increasing distrust and hostility among the parties diminished the clarity of the discussion, made motives unclear, and obscured the upshot of the meeting.[30]

Finally, as noted above, the facts that the Managers' counsel explicitly disavowed any claim that the landlord's contribution was a capital contribution at the hearings, that the Managers themselves did not claim in their testimony that the October 16 meeting settled the question of the $50,000, and that the Managers chose to let the master get his information from the parties' testimony rather than from an actual transcript of that meeting all tend to undermine their contention before the trial court and on appeal that the October 16 transcript reflects the parties' agreement to credit Ms. Kawano for a $50,000 capital contribution. As the trial court noted, this was an "extraordinarily complex and contentious dispute" in which the master "heard weeks of conflicting testimony, generally through Thai interpreters" and made "an extraordinary effort to resolve the factual disputes and place the facts into the proper legal context." The trial court wrestled with the discrepancies among the witnesses' testimony and the comments at the October 16 meeting, and on these facts, after our own review of the entire record of this case—including the October 16 transcript—we are unwilling to second guess the trial court's findings re-

jecting the claimed capital contributions just because they stemmed from a difficult sorting through of what the trial court acknowledged was "sharply conflicting evidence." *See Abulqasim v. Mahmoud*, 49 A.3d 828, 834 (D.C.2012) (stating that a finding "is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed") (citations and internal quotation marks omitted). While the Managers have identified factors that cut the other way, given the complexity of the record and the abundance of evidence supporting the trial court's adoption of the master's report, we hold that the court's findings are not clearly erroneous.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*

---

$150,000 would be divided into bonus shares for employees ($100,000) and then $50,000 to the right hand man." This again strongly suggests that both the $100,000 for employees and the $50,000 for the right hand man were intended as cash bonuses, not as capital contributions that would increase the agreed-to total investment of, at that time, $900,000, supplemented by some portion of the landlord's allowance.

30. In his testimony, Mr. Phongsvirajati acknowledged that he "was very angry at that

meeting," and the transcript of the meeting confirms a breakdown in communication. At one point, Mr. Phongsvirajati lamented the "[h]e said/she said" nature of the discussion and said that "whatever it is, the money's going nowhere, I'm keeping it all," to which Thanakorn Duangmanee replied "in the role of president, you are acting on behalf of the shareholders and by acting this way you are being abusive." Mr. Phongsvirajati threatened repeatedly to just "keep it all"—"[i]f it's too much of a headache, I seize it all."