*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 20-CV-287 & 20-CV-288

CHRISTOPHER STEINKE, APPELLANT/CROSS-APPELLEE,

V.

P5 SOLUTIONS, INC., APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(CAB4445-18)

(Hon. William Jackson, Motion Judge and Trial Judge)

(Argued January 28, 2022                    Decided September 22, 2022)

*Mitchell I. Batt* for appellant/cross-appellee.

*Denise M. Clark* for appellee/cross-appellant.

Before GLICKMAN and BECKWITH, *Associate Judges*, and THOMPSON, *Senior Judge*.*

THOMPSON, *Senior Judge*:  Appellant/cross-appellee, Christopher Steinke, was terminated from his employment with appellee/cross-appellant, P5 Solutions, Inc. ("P5"), in April 2018.  Thereafter, he initiated a lawsuit against P5, asserting

---

* Senior Judge Thompson was an Associate Judge of the court at the time of argument.  On February 18, 2022, she began her service as a Senior Judge.  *See* D.C. Code § 11-1504.

claims for violation of the District of Columbia Wage Payment and Collection Law[1] ("the WPCL" or the "Act") and breach of contract (as well as alternative claims for quantum meruit and unjust enrichment), based on P5's failure to pay him incentive compensation that he purportedly earned in 2017.[2]  After the Superior Court granted P5's motion for summary judgment on Mr. Steinke's WPCL claim but denied P5's summary judgment motion as to Mr. Steinke's other claims, the case proceeded to trial.  On February 21, 2020, a jury found in favor of Mr. Steinke on his breach-of-contract claim and awarded him $100,844.55 in damages.

Both parties have appealed.  P5 seeks review of the trial court's denial of summary judgment on Mr. Steinke's breach-of-contract claim and also challenges the trial court's exclusion at trial of one of P5's exhibits and the court's rejection of P5's proposed jury instruction regarding apparent authority.  Mr. Steinke challenges the summary judgment ruling dismissing his WPCL claim.  For the following reasons, we affirm.

---

[1] D.C. Code § 32-1301 *et seq.*

[2] Mr. Steinke's Amended Complaint and interrogatory responses refer to unpaid incentive compensation for the period from August 1, 2016, to December 31, 2017, but Mr. Steinke testified at trial that the new business he helped bring in — the basis for the incentive-compensation claim shown on one of his trial exhibits — first came in during March 2017.

# I. Background

P5 is a corporation formed under the laws of Virginia with its sole office — apparently, a rented workspace-sharing location — in Virginia. On July 5, 2016, Mr. Steinke met with Prasit Shah, co-founder and CEO of P5, to discuss the possibility of entering into a business relationship. The next day, in a letter signed by P5 President Nemisha Patel (wife of Mr. Shah), P5 confirmed that it was offering Mr. Steinke employment as "Director of Organizational Transformation and ServiceNow Practice Lead." The letter described a compensation package, including a salary ($180,000), medical and retirement benefits, and annual and sick leave, as well as a "variable compensation" package described as follows:

> A variable compensation package will be established between you and the Co-Founder of P5 Solutions, Inc. which will go into effect within your first 30 days of employment. Variable compensation may include quarterly bonuses through newly gained business/revenue from software license sales, percentage of revenue from all ServiceNow professional services, and also year-end bonus [sic], and will all be outlined more specifically in a separately defined agreement.

Mr. Steinke did not immediately accept the offer of employment, but he continued to negotiate with Mr. Shah the terms of a prospective relationship with P5.

On July 14, 2016, Mr. Shah sent an email to Mr. Steinke outlining a revised offer. The emailed outline referred to "the building of a P5 ServiceNow practice" and contained inter alia the following language:

> In summary, here are the points we discussed and agreed upon. This will need to get finalized as an agreement but here are the basics:
>
> Agreement between P5 Solutions, Inc. and Chris Steinke (also company which will be established by Chris Steinke) that during term of his employment with P5 Solutions, Inc.:
> . . .
> All new business and new clients brought into P5 by Chris Steinke related to ServiceNow licenses and services, Chris will receive a 15% commission from the profits associated with ServiceNow project/professional services. Chris will also receive 15% of any profits associated with receipt of licenses sales (i.e. licenser revenue from referrals or future sales). Profits are defined as the revenue minus expenses (labor costs). After a benchmark of $250,000 has been met by Chris Steinke, [he] will receive 25% of any profits associated with receipt of licenses or services from P5's ServiceNow practice. The profits from both licenses and services are defined as revenue minus expenses (labor costs) associated with that deal. . . .

Attached to the email was a revised offer letter that contained much of the same language as the previous letter, including the previously-quoted language regarding

variable compensation. Mr. Steinke responded to Mr. Shah's email later the same day, saying, "Looks great. Please find the signed copy attached," and he attached a signed copy of the revised offer letter. The next day, Mr. Shah sent another email to Mr. Steinke, saying, "Chris - 250k benchmark has been removed, and all work is at the 25% percentage outside of current existing SN [ServiceNow] work (only Fairfax County Government client)."

A few days later, as contemplated by the July 14 email, Mr. Steinke incorporated in the District of Columbia a limited liability company called Holstein Amalgamated LLC ("the LLC"), of which Mr. Steinke was the sole owner and CEO. Mr. Shah wrote a July 21, 2016, email seeking a recommendation for a business attorney to "draw up a legal agreement" between P5 and Mr. Steinke, "as his incentives compensation (partnership with P5) will flow into a company that he has gotten filed."

On July 29, 2016, Mr. Steinke, as the representative of the LLC, signed a Bilateral Teaming Agreement ("the Teaming Agreement" or the "Agreement"). The parties to the Teaming Agreement were P5 and the LLC. The Teaming Agreement contained the following clause: "This Agreement is the entire agreement among the Parties and supersedes any prior oral or written agreement or

understanding pertaining to this Project." The Agreement also stated that "[t]he Parties agree to negotiate the distribution of Net Profit for each project. Net Profit will be computed by using the following equation: Revenue - Cost."

From July 2016 to December 2017, Mr. Steinke billed P5 at the rate of $15,000 per month for his services and also billed P5 for expenses he incurred. According to Mr. Steinke, during that same period, he worked entirely at either client sites in Virginia or from his home in the District of Columbia; he testified during his deposition that he had never been to P5's office and had never been required to go there. He also testified at his deposition that during this same time period, there was no official employment agreement in place, no taxes were withheld from checks received from P5, and he did not have the option of participating in P5's 401(k) plan.

Mr. Steinke's arrangement with P5 changed as of January 2018. He was given a contract for full-time employment with P5, which for the first time included healthcare benefits, leave, and an optional 401(k) plan. Under the new arrangement, Mr. Steinke had a manager, George Pryor. In April 2018, Mr. Pryor terminated Mr. Steinke's employment.

Thereafter, Mr. Steinke initiated a lawsuit against P5 based on P5's failure to pay him incentive compensation, which Mr. Steinke argued was a breach of the July 2016 employment agreement and a violation of the WPCL. P5 filed a motion for summary judgment on the grounds that (1) the WPCL was inapplicable because, during the relevant time period, P5 was not an "employer" and Steinke was not an "employee," as defined by the Act; (2) there was no enforceable agreement between the parties regarding incentive compensation; and (3) Mr. Steinke waived his right to any incentive compensation to which he might otherwise have been entitled.

On July 3, 2019, the trial court entered summary judgment in favor of P5 on Mr. Steinke's WPCL claim, reasoning that P5 was not operating in the District of Columbia, was therefore not an employer under the WPCL, and, accordingly, the WPCL was inapplicable. The court did not discuss whether Mr. Steinke qualified as an "employee" under the Act during the relevant time period. The court denied P5's motion for summary judgment in other respects, determining that there were genuine issues of material fact such that summary judgment was precluded.

The breach-of-contract claim proceeded to trial. During the trial proceedings on February 19, 2020, P5 sought to introduce a summary chart to

demonstrate its calculation of 2017 overhead expenses and revenue to aid the jury in calculating Mr. Steinke's damages, should it award him any. After hearing arguments from both parties, the trial judge ruled that the summary chart was inadmissible because P5 had failed to make available the underlying data. Another disagreement between the parties arose over a jury instruction regarding apparent authority. The trial court gave the instruction proposed by Mr. Steinke rather than the one proposed by P5.

As noted, the jury returned a verdict in favor of Mr. Steinke on his breach-of-contract claim. Mr. Steinke now appeals the court's July 3, 2019 grant of summary judgment in favor of P5 on the WPCL claim. P5 appeals the court's denial of summary judgment on the issue of whether there was an enforceable agreement regarding incentive compensation (and its consideration of parol evidence in doing so). P5 also appeals the trial court's decisions to exclude its summary chart and to issue a jury instruction on apparent authority that did not align with P5's proposed jury instruction. We address these issues in turn.

## II.     Applicability of the Wage Payment and Collection Law

### A.     Whether P5 was an "employer"

Mr. Steinke argues that the trial court erroneously determined that the WPCL did not apply to the incentive-payment dispute because P5 did not fall within the WPCL statutory definition of "employer," and thus erred in entering summary judgment in favor of P5 on Mr. Steinke's WPCL claim. We review trial court decisions granting summary judgment as well as questions of statutory interpretation de novo. *District of Columbia v. Place*, 892 A.2d 1108, 1110-11 (D.C. 2006). In reviewing a grant of summary judgment, we view the record in the light most favorable to the non-moving party (here, Mr. Steinke), "who is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials." *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1004 (D.C. 2020) (internal quotation marks omitted).

The WPCL provides that an employer who fails to pay an employee wages[3] earned must "pay, or be additionally liable to, the employee, as liquidated

---

[3] The WPCL broadly defines "wages" as "all monetary compensation after lawful deductions, owed by an employer, whether the amount owed is determined

damages, 10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to treble the unpaid wages, whichever is smaller." D.C. Code § 32-1303(1), (4). The statute defines the term "[e]mployer" as including (with a few exceptions not relevant here) "every individual, partnership, firm, general contractor, subcontractor, association, corporation, the legal representative of a deceased individual, or the receiver, trustee, or successor of an individual, firm, partnership, general contractor, subcontractor, association, or corporation, employing any person in the District of Columbia." D.C. Code § 32-1301(1B). It defines "employee" as "any person suffered or permitted to work by an employer." D.C. Code § 32-1301(2). This court's WPCL case law acknowledges, however, that independent contractors are not "employees" for purposes of the WPCL. *See Sanchez v. Magafan*, 892 A.2d 1130, 1134 (D.C. 2006).

In concluding that the WPCL applies only to employers operating in the District of Columbia, the trial court reasoned that "the legislative history of the statute shows an intention to address broad economic concerns of wage theft by

---

on a time, task, piece, commission, or other basis of calculation," including as potentially relevant here any "[b]onus," "[c]ommission," or "[o]ther remuneration promised or owed" "[p]ursuant to a contract for employment, whether written or oral," "[p]ursuant to a contract between an employer and another person or entity," or "[p]ursuant to District or federal law." D.C. Code § 32-1301(3)(A), (B), (E).

District of Columbia employers, regardless of the location of their employees."

We agree that the legislative history evinces an intent by the Council of the District

of Columbia (the "Council") to reach conduct by employers operating in the

District, but we think the trial court's consideration of the legislative history did

not go quite far enough. The relevant Committee Report also evinces the

Council's intent to protect not only low-wage and minimum-wage workers in the

District, but also workers whose wages and local spending would be part of the tax

base in the District. *See* COUNCIL OF D.C. COMM. ON BUS., CONSUMER, & REGUL.

AFFS., REP. ON BILL 20-671, THE "WAGE THEFT PREVENTION AMENDMENT ACT OF

2014," at 2 (Apr. 10, 2014) [hereinafter COMMITTEE REPORT] (expressing the

Council's concern that "[u]nderpaying or stealing wages from workers lowers tax

revenues, which can depress consumer spending and stunt economic growth

because less disposable income translates into less money spent at local

businesses"). "[C]onstruing broadly the definition of 'employer' to serve the

remedial purpose of the [WPCL]," *District of Columbia v. Bongam*, 271 A.3d

1154, 1157 n.1 (D.C. 2022), we conclude that it is most consistent with the

Council's intent to interpret the term to reach entities that have agreed to pay

wages to individuals who performed their work in the District of Columbia,

whether from home or elsewhere[4] (and who could therefore be expected to spend a

---

[4] We note that a number of other courts have concluded that a jurisdiction's

portion of their wages at local businesses in the District).[5]  *See Lincoln-Odumu v.*

*Med. Fac. Assocs.*, No. 15-1306 (BAH), 2016 U.S. Dist. LEXIS 88659, at *25

---

wage-payment law applies to workers who have been permitted or required to perform their work within the jurisdiction.  *See, e.g.*, *Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 455-56 (D. Md. 2015) (holding that the Maryland wage-payment law "applies to a company that either allows an employee to work in Maryland or instructs the employee to be present at a work site in Maryland," and explaining that "[a]ll that is required is that the individual work to some extent in Maryland"; applying the Maryland law where the plaintiff "worked frequently from his home in Maryland," "conducted various site visits to properties in Maryland that were the subject of loans, attended meetings at the HUD office in Baltimore, and attended various conferences and events in Maryland to generate business," and was encouraged "to spend minimal time in his office in Washington, D.C."); *Himes Assocs., Ltd. v. Anderson*, 943 A.2d 30, 46, 48 (Md. Ct. Spec. App. 2008) (applying the Maryland wage-payment law where the plaintiff worked for a Virginia corporation and worked out of the corporation's Virginia headquarters but served as a project manager for a project in Virginia that required him "to attend meetings twice a month at Lockheed Martin's Baltimore office, in the State of Maryland").

[5] The record contains other support, too, for our conclusion that P5 was an "employer" within the meaning of the WPCL.  Although Mr. Steinke testified at his deposition that he did not do any "billable work" for P5 clients located in the District, his affidavit supporting his opposition to P5's motion for summary judgment indicates that during his tenure with P5, Mr. Steinke spent approximately 10% of his time "either working at P5 client sites located in D.C. or meeting with P5 prospective clients located in D.C."  In addition, the General Declaration of P5 employee Justin Null avers that he "spent time together" with Mr. Steinke in the WMATA D.C. office on dates that may have been as early as April 2017.  (P5's opening brief states that WMATA became a P5 client in September 2017.)  The record thus contains some support for a conclusion that P5 *did* operate within the District of Columbia in 2017.  And even if Mr. Steinke did not work at P5 prospective-client sites located in the District in 2017, the WPCL definition of "employer" reaches anyone who "employ[s] *any person* in the District of Columbia."  D.C. Code § 32-1301(1)(B).  If Mr. Null did work for P5 in the District in 2017, that would be enough to bring P5 within the WPCL definition of

(D.D.C. 2016) (observing that the WPCL legislative history "evince[s] the Council's desire to ensure the broad [geographical] application" of the WPCL).

With regard to Mr. Steinke's work from his home in the District, the documentary record (a January 22, 2018, email) shows that P5 was aware that Mr. Shah "ha[d] been working predominantly at home." We acknowledge that P5 "disputes the email text's authenticity" and that Mr. Shah testified during his deposition that P5 required and expected that Mr. Steinke would perform his work at client sites. But even assuming that Mr. Shah's testimony accurately described P5's intent and expectation, P5's sufferance of Mr. Steinke's work from his home in the District of Columbia on any dates during 2017 is consistent with P5's "employer" status vis-à-vis Mr. Steinke (unless Mr. Steinke was an independent contractor, an issue we discuss *infra*).

---

an "employer." *Cf. Redick v. E Mortg. Mgmt., LLC*, Civ. Action No. 11-1260-GMS-CJB, 2013 U.S. Dist. LEXIS 36002, at \*28 (D. Del. 2013) ("[T]he reference to 'any person' in the [New Jersey Wage Law's] definition of '[e]mployer' could simply amount to a requirement that the employer employ 'any person' in New Jersey – but not necessarily *the person* bringing the claim-at-issue.").

## B.      Whether Mr. Steinke was an "employee"

Having determined that P5 was not an "employer" for purposes of the WPCL, the trial court had no need to reach the issue of whether Mr. Steinke was an "employee" within the meaning of the Act in order to conclude that the Act was inapplicable. We cannot avoid that question, as our rejection of the trial court's rationale for concluding that P5 was an "employer" during the relevant time period is not sufficient to enable us to conclude that the WPCL applies in this case.

We have not established a WPCL-specific test for distinguishing employees from independent contractors, but because of the similarity between the employer-liability provisions of the WPCL and those of the federal Fair Labor Standards Act (the "FLSA"), our sister federal courts have looked to the FLSA test for "employee" status to assist in such a determination under the WPCL. *See Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 146 (D.D.C. 2011) ("With respect to employers' liability, [the WPCL is] construed consistently with the FLSA."); *Ventura v. Bebo Foods Inc.*, 738 F. Supp. 2d 1, 5 n.2 (D.D.C. 2010) (same); *see also Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) (noting the recognition by Congress and the courts that "of all the acts of social legislation, the [FLSA] has the broadest definition of 'employee'").

The FLSA test looks to whether the "economic reality" indicates an employer-employee relationship, rather than an independent contractor one. *See Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961).

The "economic reality" test considers various factors, including:

1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4) whether the service rendered requires a special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001); *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534-35 (7th Cir. 1987). "No one factor standing alone is dispositive[,] and courts are directed to look at the totality of the circumstances and consider any relevant evidence." *Morrison*, 253 F.3d at 11. "[T]he final and determinative question must be whether the total[ity] of the [circumstances considered] establishes the personnel are so dependent upon the

business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit." *Id.* (internal quotation marks omitted). Courts applying state wage laws have applied the foregoing FSLA factors and additional factors, such as "whether or not the work is a part of the regular business of the principal" and "whether or not the parties believe they are creating the relationship of employer-employee." *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 658 (9th Cir. 2022) (quoting *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 769 P.2d 399, 404 (Cal. 1989)).

Courts have held that whether an individual is an "employee" within the meaning of the FLSA is a legal question. *Morrison*, 253 F.3d at 10 n.3 (adding that "[n]evertheless, [a]ny subsidiary factual issues leading to this conclusion are, of course, questions of fact for the [finder of fact]." (internal quotation marks omitted)).[6] But even if we consider Mr. Steinke's "employee" status for purposes of the WPCL to be a mixed question of fact and law, *see Hickey v. Bomers*, 28 A.3d 1119, 1123 (D.C. 2011) ("The determination of whether an employer-

---

[6] *See also Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) ("The ultimate conclusion as to whether a worker is an employee or independent contractor under the FLSA presents a legal question that we review de novo."); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) ("[T]he court must decide, as a matter of law, whether the individual is an 'employee' under the FLSA.").

employee relationship exists [under the District of Columbia's unemployment compensation law] involves a mixed question of law and fact."), we may decide the issue as a matter of law where the facts are undisputed and "only one conclusion could reasonably be drawn from the evidence." *Kumar v. D.C. Water & Sewer Auth.*, 25 A.3d 9, 16 (D.C. 2011). Viewing the evidence in the light most favorable to Mr. Steinke and based largely on his own testimony, and giving due regard to the Council's cautionary words about misclassification of workers as independent contractors, *see* COMMITTEE REPORT at 2, we conclude for the following reasons that Mr. Steinke was not a P5 "employee" during the relevant time period and that summary judgment therefore was proper on his WPCL claim.

As to "control as to the manner in which the work [was] to be performed," *Lauritzen*, 835 4.2d at 1535, the record contains considerable evidence that Mr. Steinke exercised control over the manner in which he performed his work. He testified at his deposition that he had responsibility for "defining how [P5] would run" the ServiceNow line of the business. He further testified that he generally determined how many hours he would work each day (and Mr. Shah agreed in his deposition that Mr. Steinke wanted to set his own working hours and not be an employee.). In addition, rather than utilize "leave" or seek approval from P5 to take time off, Mr. Steinke just let P5 know when he "was going to be gone."

According to his testimony, Mr. Steinke also chose to work from his home, leaving Mr. Shah without "any awareness" of where Mr. Steinke was working on any given day. In opposing summary judgment, Mr. Steinke detailed a multi-page list of ways in which he claimed Mr. Shah directed his work (asking Mr. Steinke to, e.g., "create marketing content," "attend [a] meeting," and "provide status reports"), but none of the entries appears to direct the manner in which Mr. Steinke was to accomplish the various listed tasks.[7]

"A court's most important task in analyzing the profit or loss factor is to ascertain which party controls the major determinants of the worker's ability to make a profit." *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 308 (5th Cir. 1998) (King, J., concurring) ("If the employer largely controls these major determinants, this points toward a finding of employee status. On the other hand, if the workers themselves exert substantial control over their ability to

---

[7] *See Sanchez*, 892 A.2d at 1134 ("If an employer has the right to control and direct the work of an individual, not only as to the results achieved, *but also as to the details by which that result is achieved*, an employer/employee relationship is likely to exist." (emphasis added) (internal quotation marks omitted)); *cf. Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 752 (1989) (determining that the fact that a putative employer "directed enough of Reid's work to ensure that he produced a sculpture that met their specifications" was not enough to create an employment relationship when weighed against other factors, including that Reid "worked in his own studio in Baltimore, making daily supervision of his activities from Washington practically impossible").

profit or over the likelihood that they will suffer loss, they are more like independent contractors."). As for Mr. Steinke's opportunity for profit depending upon his managerial skill, the jury found that he was entitled to a portion of P5's profits based on the incentive compensation agreement, which tied Mr. Steinke's commissions to his success in selling ServiceNow professional services and generating licenser revenue from referrals and sales. Mr. Steinke's June 26, 2017, email to Mr. Shah indicates that Mr. Steinke exerted control over these opportunities for profit through "water[ing] and nurtur[ing]" relationships with ServiceNow partners and through expanding P5's work for clients to whom the company was introduced. There was no evidence that Mr. Steinke made any capital investment in P5 that exposed him to an opportunity for loss, but on balance, we think the foregoing evidence weighs on the side of his independent contractor status.

As to investment in materials required for Mr. Steinke's work, the record reflects that Mr. Steinke used his own phone and laptop computer for work at first, but when his laptop broke, P5 agreed to replace it with a "better working" company laptop. Mr. Steinke testified that he never used the P5 office, and thus he made no use of any equipment furnished there. We see no evidence in the record

that Mr. Steinke (or the LLC) had any employees. In sum, this evidence weighs on both sides of the employee vs. independent contractor argument and is neutral.

The service Mr. Steinke provided did require special skill, specifically Mr. Steinke's experience with ServiceNow. In his deposition, Mr. Steinke described his previous experience with the ServiceNow platform and testified that P5, by contrast, was a "new ServiceNow partner," that Mr. Shah had little or no ServiceNow experience, and that Mr. Steinke wanted to help P5 "grow a company." (Similarly, Mr. Steinke testified at trial that Mr. Shah was looking for someone to "help build [the ServiceNow] line of business," and that Mr. Steinke was interested in a company "just getting started" where "we could build something.") The July 6, 2016, offer letter expressed P5's confidence that Mr. Steinke had the "experience, skills, and relationships to succeed and help P5 grow." These same facts are pertinent to other factors identified above: the extent to which the service rendered is an integral part of the putative employer's business, and whether it is a part of the regular business of the principal. The record, including Mr. Steinke's testimony, seems to indicate that the ServiceNow work became a regular or integral part of P5's business only with Mr. Steinke's arrival; indeed, as far as the record shows, the ServiceNow logo or legend

("ServiceNow Services Partner") began appearing on P5's stationery only after the company obtained Mr. Steinke as its ServiceNow lead.

It appears from the record that, as originally envisioned, Mr. Steinke's position was permanent, a fact that suggests "employee" status. *See Thompson,* 779 F. Supp. 2d at 150. But that is overshadowed by the facts pertinent to "whether . . . the parties believe[d] they [we]re creating the relationship of employer-employee." *Bowerman*, 39 F.4th at 658. Mr. Steinke testified in his deposition that he "determined to open up Holstein Amalgamated and be represented as a separate company rather than a direct employee of the company." Further, Mr. Steinke acknowledges that there was no official employment agreement in place during the period in dispute, that P5 never used the W-4 Mr. Steinke filled out in 2016, and that — unlike a typical employee — Mr. Steinke invoiced P5 for his services each month.[8] The record also indicates that no taxes were withheld from checks received from P5, that Mr. Steinke did not have the option of participating in P5's 401(k) plan (because, according to Ms. Patel's testimony about advice from ADP, contractors are not allowed to participate in the

---

[8] "[P]ayments by invoice . . . are common indicators of an independent contractor relationship." *Janette v. Am. Fid. Group, Ltd.*, 298 Fed. App'x 467, 475 (6th Cir. 2008).

company's 401(k) plan or benefits plans), and that Mr. Steinke benefitted from "sort of an unlimited vacation policy."[9]  And as to whether Mr. Steinke was so dependent upon P5 that he should be deemed to come within the protection of the WPCL, it is noteworthy that the Teaming Agreement did not bar his LLC from doing work for others; it provided that "[n]othing in this agreement shall preclude either party from conducting business with existing customers."[10]

An additional significant fact is that after a year of being "represented as a separate company," Mr. Steinke decided that he wanted to become an at-will payroll employee.  The parties' relationship at that point changed: he started receiving health insurance, he was given the option to participate in a 401(k) plan, and he was assigned a direct supervisor.  At that point, Steinke was clearly a dependent employee.  This change in the parties' relationship highlights the fact

---

[9] *Cf. Cmty. for Creative Non-Violence*, 490 U.S. at 753 (noting that the fact that a putative employer "did not pay payroll or Social Security taxes, provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds" supported the conclusion that Reid was an independent contractor rather than an employee for purposes of the copyright work-for-hire doctrine).

[10] *Razak v. Uber Techs., Inc.*, No. 16-573, 2018 U.S. Dist. LEXIS 61230, at *41 (E.D. Pa. Apr. 11, 2018) ("Plaintiffs . . . are permitted to work for competing companies.  This is well-established as a leading indicator that a worker is an independent contractor.").

that, prior to signing the at-will employment agreement, Mr. Steinke was operating in a much more independent way.

These additional considerations tip the balance. We conclude as a matter of law that Mr. Steinke was not an employee but was instead an independent contractor during the relevant time period, bringing him outside the ambit of the WPCL. "In the absence of procedural unfairness, we may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge." *Stone v. Landis Constr. Co.*, 120 A.3d 1287, 1289 n.6 (D.C. 2015) (internal quotation marks omitted). "The requirement of procedural fairness is satisfied here, since the parties have fully briefed and argued th[e] substantive question" of Mr. Steinke's employee status. *Id.* The trial court ultimately arrived at the proper conclusion in dismissing Steinke's WPCL claim, so we affirm the trial court's ruling.

### III.   The Breach-of-Contract Claim

### A.   The Denial of Summary Judgment

In P5's appeal, it argues that the trial court erred in denying its motion for summary judgment because there was no enforceable agreement between the parties regarding incentive compensation. Rather, P5 argues, with respect to incentive compensation, the conversations and agreements between the parties merely amounted to an agreement to agree in the future, which is unenforceable under Virginia law.[11]

We begin our analysis by questioning whether it is proper for P5 to appeal the denial of its motion for summary judgment after a trial and final judgment on the merits. In *Morgan v. American University*, this court announced a "general rule that denial of summary judgment after a trial and final judgment is not an appealable order." 534 A.2d 323, 328 (D.C. 1987). We did leave open "the

---

[11] *See CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 188 (Va. 2018) ("In Virginia, it is well-settled that contractual provisions that merely set out agreements to negotiate future subcontracts are unenforceable." (internal quotation marks omitted)). The trial court determined that Virginia law (which the Teaming Agreement stated would govern) applies to the breach-of-contract claims in this case, and neither party disputes this determination on appeal.

possibility that . . . one of the exceptions recognized in other jurisdictions might apply in an appropriate case where review of a denial of summary judgment would not 'defeat the fundamental purpose of judicial inquiry.'" *Id.* at 328-29 (footnote omitted) (quoting *Home Indemnity Co. v. Reynolds & Co.*, 187 N.E.2d 274, 278 (Ill. App. Ct. 1962)).[12] We need not decide whether this case falls within an exception to the *Morgan* rule because Mr. Steinke has not taken issue with P5's appeal on this basis and because, in any event, we have little trouble rejecting P5's argument that it was entitled to summary judgment on Mr. Steinke's breach-of-contract claim.

As already noted, our review of rulings on motions for summary judgment is de novo. *Washington v. District of Columbia*, 137 A.3d 170, 173 (D.C. 2016). We conduct an independent review of the record to determine whether there were genuine issues of material fact in dispute at the time of the ruling and whether the moving party was entitled to judgment as a matter of law. *Id.* We examine the

---

[12] We cited as an example the situation presented in *St. Paul Fire and Marine Ins. Co. v. Speerstra*, 666 P.2d 255, 257 (Or. Ct. App. 1983), where the denial of respondents' motion for summary judgment was reviewable because final judgment was entered for respondents and they had no reason or means to assert that the denial of their summary judgment motion was error. *Morgan*, 534 A.2d at 329 n.13. We also note that some jurisdictions recognize an exception to the general rule when the denial of summary judgment was "based on the interpretation of a purely legal question." *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1521 (10th Cir. 1997).

evidence in the light most favorable to the nonmoving party to determine whether there was any evidence upon which a jury "could properly proceed to find a verdict for the [non-moving] party." *Hamilton v. Howard Univ.*, 960 A.2d 308, 313 (D.C. 2008).

As support for its argument that the parties had only an "agreement to agree" regarding incentive compensation, P5 points to (1) the language in the Teaming Agreement that says, "The Parties agree to negotiate the distribution of Net Profit for each project," and (2) the statement in the Teaming Agreement that the Agreement was "the entire agreement among the Parties [that] supersede[d] any prior oral and written agreement or understanding pertaining to [the] Project." P5 argues that it was error for the trial court to look beyond the four corners of the Agreement, to parol evidence, to create a factual ambiguity as to whether there was an agreement regarding incentive compensation.

We are unpersuaded by P5's argument because, reading the Teaming Agreement in the light most favorable to Mr. Steinke as the non-moving party, we agree that it raises or leaves unresolved a number of material factual issues. The Agreement declares that it was the entire agreement between the parties — P5 and the LLC — but it does not say anything about the prior discussions between P5 and

Mr. Steinke, or about Mr. Steinke's acceptance of P5's revised proposal regarding the incentive compensation that would be paid to Mr. Steinke (not to the then-not-yet-existent LLC). Moreover, the Teaming Agreement can be read to refer to a plan to agree on *how* net profit would be distributed (e.g., on what schedule net profit would be divided), rather than a plan to agree on *whether* the LLC or Mr. Steinke was entitled to share in the profit in the first place. These are just a few reasons why the trial court did not err in determining that there were issues of fact regarding the parties' intent and the circumstances surrounding the Teaming Agreement that precluded summary judgment.

We are satisfied that the record at the summary judgment stage would have permitted (though it did not compel) a finder of fact to find (as the jury eventually did find, and as Mr. Steinke argues) that the parties had reached a binding agreement regarding basic and incentive compensation as of July 15, 2016, (as supported by the fact that P5 effectively paid Mr. Steinke the salary promised in Mr. Shah's July 2016 offer letter and email) and did not intend for the Teaming Agreement (which mentioned no compensation amount) to disturb that agreement. As the trial court identified, "the frequency of the communication between the parties during this time period, combined with the detailed compensation and employment terms laid out in the July 14 email, the attached offer letter of

employment, and the July 15 email" established a genuine dispute of material fact as to whether the parties reached an enforceable agreement on the terms of incentive compensation. At the motion stage, it would have been inappropriate for the trial court to grant summary judgment and prevent this issue from going to trial. Therefore, we affirm the trial court's denial of P5's motion for summary judgment on this issue.

### B.     The Exclusion of P5's Summary Exhibit

P5's next argument focuses on its trial Exhibit 11, which set out "Defendant's calculation of overhead for the contracts at issue." The exhibit was not specifically discussed at the pre-trial conference, but it was among the mass of exhibits that the court ruled would be admitted (a ruling that Mr. Steinke asserts and the transcript states pertained only to plaintiff's exhibits). In a supplement to the parties' Joint Pretrial Statement and at trial, however, Mr. Steinke's counsel objected to its admission, arguing that P5 had not presented predicate testimony and also had not previously provided Mr. Steinke with underlying data from which the summary document was created. P5 contends that the trial court abused its discretion in sustaining Mr. Steinke's objection to the admission of the summary exhibit.

Our case law establishes that a summary of "voluminous records" is admissible "if the original source material is available for verification of the summary's accuracy." *Roberts v. United States*, 508 A.2d 110, 112 (D.C. 1986). P5 contends that it made the summary's original source documents available by (repeatedly) offering to allow Mr. Steinke's counsel to examine its banking records during discovery. The trial court determined that because the documents P5 made available during discovery were not the same as the source documents from which the summary chart was made, the availability requirement was not met.

We review a trial court's evidentiary decisions for abuse of discretion, "broadly defer[ring] to the trial court due to its 'familiarity with the details of the case and its greater experience in evidentiary matters.'" *Johnson v. United States*, 960 A.2d 281, 294 (D.C. 2008) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008)). With this deference in mind, we affirm the trial court's decision to exclude P5's summary exhibit. We do so in part because P5 has not enabled us to understand (and, more to the point, we see no evidence that P5 enabled the trial court to understand) how banking records, which presumably do not show which expenditures for overhead were allocable to the projects on which Mr. Steinke worked, would have enabled Mr. Steinke to verify the accuracy of

P5's exhibit showing the overhead expenses it deducted from each project's revenues to perform its calculation of damages from any breach of an agreement regarding incentive compensation. We therefore decline to disturb the trial court's determination that P5 failed to meet the availability requirement for admission of its summary exhibit.

There is an additional reason why we decline to disturb the trial court's ruling. The jury verdict and damages award show that the jury was persuaded that P5 and Mr. Steinke reached an agreement regarding incentive compensation in July 2016. The record shows that the proposal Mr. Steinke accepted included the statement (which appears twice in Mr. Shah's revised offer email) that "[p]rofits are defined as the revenue minus expenses (labor costs)." In light of the jury verdict finding that P5 breached a contract with Mr. Steinke, we conclude that exclusion of P5's summary exhibit was harmless error, if it was error at all, because the jury presumably would not have accepted a damages calculation that deducted other overhead expenses, and not just "labor costs," from project revenues to determine the incentive compensation P5 owed Mr. Steinke. That is, the jury appears to have found — accepting Mr. Steinke's position — that there was an agreement based on Mr. Steinke's acceptance of the revised offer outlined in Mr. Shah's July 14, 2016, email, and not merely an agreement to negotiate

regarding profit-sharing as referenced in the Teaming Agreement (with its reference to computing "Net Profit" as "Revenue - Cost").

## C.     The Jury Instruction on Apparent Authority

One of P5's theories at trial was that the putative agreement between Messrs. Steinke and Shah regarding incentive compensation was invalid and unenforceable because, while Mr. Shah had authority to negotiate an agreement with Mr. Steinke, Mr. Shah did not have authority — actual or apparent — to enter into such an agreement without the express approval of P5 co-founder Nemisha Patel. That defense theory set the stage for a jury instruction on the law regarding apparent authority. P5 requested the following instruction:

> An individual may have authority to negotiate an agreement, but not have the authority to bind a principal. The principal may be bound if the individual had apparent authority to bind the principal. The individual does not have apparent authority to bind the principal if the evidence demonstrates that the other party had no basis to conclude the individual had authority to bind the principal. . . .

Mr. Steinke requested an instruction that was phrased differently, and the trial court ultimately issued the following instruction based on the language Mr. Steinke had proposed:

> An agreement is binding on the company where its agent has either actual or apparent authority. An act is within an agent's apparent authority if, in view of the character of his actual and known duties, an ordinarily prudent person, having a reasonable knowledge of the usages of the business in which the agent is engaged, would be justified in believing that he is authorized to perform the act in question.

The trial court chose that instruction because it would better assist the jury in understanding "how [to] determine whether or not there was apparent authority."

P5 now challenges the court's decision regarding the jury instruction. It argues that the jury instruction given was an inaccurate reflection of Virginia law in that it failed to explain that an individual (Mr. Shah) might have had authority to negotiate an agreement on behalf of P5 without authority to bind P5.[13] P5 asserts that it was prejudiced by the trial court's failure to convey to the jury through its instruction that Mr. Steinke needed to present evidence that Mr. Shah had authority to bind P5, as P5's proposed instruction conveyed.

We review a court's refusal to issue a particular jury instruction for abuse of discretion, "which may be found if the court's charge as a whole does not fairly

---

[13] The instruction issued by the court was drawn directly from Virginia case law. *See Wright v. Shortridge*, 73 S.E.2d 360, 364-65 (Va. 1952). We do not discern any way in which the issued instruction was not an accurate and fair representation of the applicable law.

and accurately state the applicable law." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 898 (D.C. 2008). However, we review the legal accuracy of the contents of the jury instruction actually given de novo. *Brown v. United States*, 139 A.3d 870, 875 (D.C. 2016). "When the reviewing court concludes that the trial court erred while instructing the jury, the question whether the error requires reversal ordinarily invokes harmless error analysis . . . ." *Blaine v. United States*, 18 A.3d 766, 775 (D.C. 2011).

We conclude that the trial court did not abuse its discretion in choosing to give a jury instruction that included a straightforward definition of apparent authority, which P5's proposed instruction lacked. Additionally, we are not persuaded that it was necessary to instruct the jury that Mr. Steinke had the burden to prove that Mr. Shah had actual or apparent authority to bind P5, given that the jury was already instructed that "[t]he plaintiff bears the burden of proof."

Finally, as to the claimed harm from the court's failure to draw the jury's attention to a distinction between authority to negotiate and authority to bind, we are persuaded that P5 was not prejudiced by the omission. In her trial testimony, Ms. Patel agreed that a reasonable person could think that the "co-founder" of P5 was Mr. Shah. This was significant testimony because the revised employment

offer accepted by Mr. Steinke specified that "[a] variable compensation package will be established between you and the Co-Founder of P5." Ms. Patel's testimony essentially acknowledged to the jury that Mr. Steinke could reasonably believe that Mr. Shah, as co-founder, had agreed to (and not merely negotiated) an incentive compensation package and had authority to set the 25% incentive compensation that he confirmed in an email to Mr. Steinke.[14] We think her testimony would have had the same impact even if the jury had heard P5's favored instruction that "[t]he principal may be bound if the individual had apparent authority to bind the principal." Given that, we are unpersuaded by P5's argument that the trial court abused its discretion in issuing the jury instruction, as any error was harmless. *See Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979) (prejudice is a necessary component of abuse of discretion).

---

[14] Ms. Patel's concession might have been based just as appropriately on Mr. Shah's role as the CEO of P5. "[A]t least one court has found that where a corporation appoints someone to act as chief executive officer and chairman of the board . . . appointing a person to such a position may, in itself, create apparent authority in an employee." *Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi*, 15 F. Supp. 2d 1, 8 (D.D.C. 1997) (internal quotation marks omitted) (quoting *Fed. Deposit Ins. Corp. v. Tex. Bank of Garland*, 783 S.W.2d 604, 607 (Tex. App. 1989)). Similarly, "[c]ourts have commonly imposed liability based on 'apparent authority' upon a corporation," particularly when the person making the representation at issue "is an important corporate official." *In re Atl. Fin. Mgmt., Inc.*, 784 F.2d 29, 32 (1st Cir. 1986) (citing 10 R. Eickhoff, *Fletcher on Corporations* § 4886 (1978 & Supp. 1985)).

## IV. Conclusion

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*